**VELOCITY INTERNATIONAL, INC. d/b/a Velocity Broadcasting, Plaintiff,**

v.

**CELERITY HEALTHCARE SOLUTIONS, INC. f/k/a Celerity Healthcare Solutions, LLC, Defendant and Third–Party Plaintiff,**

v.

**Philip Elias, Third–Party Defendant.**

Civil Action Nos. 09–102, 09–151.

United States District Court, W.D. Pennsylvania.

Nov. 21, 2011.

Barbara A. Scheib, Cohen & Grigsby, P.C., Pittsburgh, PA, for Plaintiff.

John H. Stachler, Martin, Folino, Harmon & Stachler, Dayton, OH, Thomas A. Berret, Chad I. Michaelson, Meyer, Unkovic & Scott, Pittsburgh, PA, for Defendant.

## *MEMORANDUM*

WILLIAM L. STANDISH, District Judge.

### I

Before the Court are cross-motions for summary judgment under Fed.R.Civ.P. 56 filed by Plaintiff, Velocity International, Inc. ("Velocity"), and Defendant, Celerity Healthcare Solutions, Inc. ("Celerity"), in connection with claims asserted by Velocity in Civil Action Nos. 09–102 and 09–151. (Docket No. 73, No. 86). In addition, Velocity and Third–Party Defendant, Philip Elias ("Elias"), move for summary judgment with respect to the counterclaims and third-party claim asserted by Celerity in this litigation. For the reasons set forth below, (1) Celerity's motion for summary judgment on Velocity's breach of contract claim (in Civil Action No. 09–102) relating to Celerity's alleged liability for cancellation fees will be granted and Velocity's cross-motion for summary judgment on this claim will be denied; (2) Celerity's motion for summary judgment on Velocity's Lanham Act claims (in Civil Action No. 09–151) will be granted; (3) Celerity's motion for summary judgment on Velocity's breach of contract claim (in Civil Action No. 09–151) relating to the limited license granted to Celerity to use Velocity's trademarks and service marks will be granted and Velocity's cross-motion for summary judgment on this claim will be denied; (4) Celerity's motion for summary judgment on Velocity's breach of contract claim (in Civil Action No. 09–151) relating to Celerity's alleged solicitation of one of Velocity's business partners will be granted; (5) Velocity's request for a declaratory judgment (in Civil Action Nos. 09–102 and 09–151) will be dismissed as moot; (6) Velocity's motion for summary judgment on Celerity's first, second, third, fourth and sixth counterclaims will be denied; (7) Elias's motion for summary judgment on Celerity's fourth counterclaim will be denied; and (8) Celerity's request for a declaratory judgment in its fifth counterclaim will be dismissed as moot.

### II

The following facts are undisputed:

### *History and Nature of Velocity/Celerity Relationship*

Velocity provides program development, production and other services for direct broadcast marketing and informational programs in various industries, including the pharmaceutical industry. (Docket No. 97, ¶ 1). The principals of Velocity are Elias, President and Chief Executive Officer ("CEO") (Docket No. 74–2, p. 7 (Depo. p. 23)),[1] Jeffrey Esswein ("Esswein"), Chief Operating Officer ("COO") (Docket No. 77–6, p. 4 (Depo. p. 9)), and Susan Franklin ("Franklin"), Senior Vice President, Strategic Business Development ("Sr. VP") (Docket No. 76–5, p. 4 (Depo. p. 11)).

Typically, Velocity's programs are produced at a studio in Pittsburgh and simultaneously broadcast in high definition ("HD") to multiple locations. Velocity maintains contractual relationships with

---

1. Russell Rice was the President of Velocity for a portion of the time period that is relevant in this case. He left Velocity in 2008. (Docket No. 76–5, p. 4 (Depo. p. 12), No. 79–8, p. 6 (Depo. p. 15)).

Morton's The Steak House ("Morton's") and Maggiano's Little Italy ("Maggiano's") restaurants for the provision of private dining rooms at locations throughout the country in which guests can view Velocity's invitation-only broadcasts in proprietary Velocity HD suites. (Docket No. ¶¶ 2, 10).

Velocity markets its broadcast services through two separate sales channels: direct sales and reseller sales. With regard to direct sales, companies wishing to purchase Velocity's broadcast services deal with and enter into contracts with Velocity, and payment is made to Velocity by the end-user customer that is sponsoring the broadcast. As to reseller sales, authorized Velocity resellers purchase Velocity's broadcast services from Velocity for resale to end-user customers, and Velocity is paid by the resellers. Resellers may sell additional complementary value-added services and may mark up the prices for Velocity's broadcast services. Resellers also earn commissions on their sales of Velocity broadcasts. Velocity uses a uniform Rate Card for direct sales and reseller sales. (Docket No. 97, ¶¶ 3–7, 161).

Velocity's resellers enter into master agreements with Velocity that govern the relationship and establish payment terms for the private broadcasts purchased by the resellers for their customers. Velocity's reseller agreements contain provisions relating to reserving and paying for the private dining rooms in the restaurants used for broadcasts. (Docket No. 97, ¶¶ 8–9).

Kurt Janson ("Janson") and Timothy Gatzulis ("Gatzulis") were the principals of Celerity.[2] Ann O'Toole ("O'Toole") was Celerity's Director of Client Services. (Docket No. 81–1, pp. 6–7 (Depo. pp. 20–22)). From approximately July 2006 until

September 2, 2009, Celerity was a reseller of Velocity broadcasts. During this period of time, Velocity and Celerity signed two successive master agreements that governed the terms of their relationship. The initial reseller agreement, which became effective on August 1, 2006, was signed on Velocity's behalf by Elias and on Celerity's behalf by Janson. (Docket No. 90–2, No. 97, ¶¶ 11–14).

Among the services to be provided by Velocity under the initial reseller agreement with Celerity were network access, event management and broadcast production (which included a set, cameras with teleprompters, a director, producer, crew and show host and make-up and wardrobe assistance). The terms of the initial reseller agreement authorized Celerity to resell Velocity's services to Celerity's customers in the pharmaceutical, medical and healthcare-related industries. In addition, the initial reseller agreement granted Celerity "Limited Exclusivity in the field of oncological pharmaceuticals including the field of hematology," which meant "that Velocity will not sell directly or authorize any third party to resell Velocity Services to any clients or for any Broadcast content in or directly related to the field of oncological or hematological pharmaceuticals" during the term of the agreement. (Docket No. 90–2, pp. 1–3, No. 97, ¶¶ 16–19).

The provision in the initial reseller agreement relating to intellectual property ("IP") rights stated:

\* \* \*

6. *General Terms and Conditions*

\* \* \*

d. All rights, title and interest not otherwise reserved by Velocity with your

---

**2.** Celerity ceased business operations in early October 2009. (Docket No. 81–1, p. 6 (Depo. p. 19)).

prior written consent with respect to advertisements, copy, layouts, scripts, commercials, art work, designs, and other materials or documents prepared, purchased or furnished by Velocity on your behalf ("Work Product") shall be your property (or the property of Celerity Clients per separate agreement between you and the applicable Celerity Client) and shall be "works for hire" owned by you with right of copyright and, if in Velocity's possession, will be delivered to you upon request.[3] You hereby grant to Velocity a perpetual, irrevocable, royalty-free, right and license to use, copy, distribute or transfer ("Use") the Work Product, provided such Use is not in competition with, or materially adverse to your interests or the interests of Celerity Clients. You will obtain all necessary rights from Celerity Clients to give full force and effect to the foregoing provision, and shall indemnify Velocity to the extent set forth in section 6.e. below for any breach of this provision.

\* \* \*

(Docket No. 80–1, p. 6).

In March 2008, Velocity and Celerity executed a new master agreement with an effective date of October 1, 2007 ("the second reseller agreement").[4] (Docket No. 90–3, No. 97, ¶ 21). With respect to sales and marketing, the second reseller agreement provided:

\* \* \*

## II. Sales

A. **Reseller Authorization:** Velocity hereby authorizes Reseller to market, promote and sell Velocity Services to Prospective Customers, . . ., during the Term subject to the terms and conditions of this Agreement. Reseller will use its best efforts to identify Prospective Customers, and to promote and sell Velocity Services during the Term to Prospective Customers. The foregoing authorization may be limited to a particular industry or market segment and/or be subject to limited exclusivity if so specified in Exhibit A under "Market Scope".

B. **Customer Agreements:** Reseller will enter into a written agreement with each Customer ("Customer Agreement"). Velocity shall not be a party to any Customer Agreement, but shall be deemed a third party beneficiary pursuant to Customer Agreements. Velocity understands and acknowledges that there will be circumstances under which the agreements between Reseller and Customer will not mirror Exhibit B, but such fact shall not relieve Reseller of its obligations to Velocity hereunder except with Velocity's prior written approval in each instance. Nevertheless, Reseller agrees to use best efforts to secure an agreement with Customer that that (sic) is consistent with the terms set forth in Velocity's standard customer agreement (titled "Velocity Broadcast (sic) Agree-

---

**3.** In the case of a "work made for hire," the employer or other person for whom the work is prepared is considered the author under federal copyright law. Unless the parties have expressly agreed otherwise in a written instrument signed by them, the employer or other person for whom the work is prepared owns the copyright in the work. 18 C.J.S. § 23 (2011), citing 17 U.S.C.A. § 201(b).

**4.** The second reseller agreement between Velocity and Celerity was signed on the companies' behalf by Elias and Gatzulis, respectively. (Docket No. 90–3, No. 97, ¶ 24).

ment", a sample of which is attached as Exhibit B). . . .

\* \* \*

F. **Trademarks:** Solely for purpose of the marketing activities described in section II.C above, Velocity hereby grants to Reseller the limited, non-exclusive right and license to use Velocity's trademarks and services (sic) marks strictly in accordance with the guidelines for such usage provided by Velocity to Reseller from time to time. Velocity reserves the right to revoke the foregoing right and license to protect and preserve Velocity's rights in its trademarks and service marks and the goodwill associated therewith. Except for the limited rights granted in the foregoing, Reseller obtains no other rights in Velocity Trademarks and all rights are hereby reserved by Velocity.[5]

\* \* \*

(Docket No. 90–3, p. 2).

As to fees, reporting anticipated sales, leads and non-solicitation, the second reseller agreement stated;

\* \* \*

### III. Fees for Velocity Services; Sponsorship Commissions

A. **Fees and Payment:** Reseller will pay Velocity the fees set forth in Velocity's then-current Rate Cards for Velocity Services ("Fees") and will use best efforts to do so in accordance with Velocity's standard payment terms as set forth therein for each Broadcast that Reseller sells to a Customer. Reseller ac-

knowledges that it shall, under any such circumstances, secure payment in full to Velocity on or before the date of such Broadcast, unless Velocity-agrees to alternate payment provisions prior to the Broadcast. Reseller may mark-up such Fees as charged to its Customers and retain any such mark-up amounts. . . .

\* \* \*

### IV. Sales Registration Process and Reporting

\* \* \*

B. **Reporting:** Reseller shall provide to Velocity a monthly forecast of anticipated sales of Velocity Services which includes the following information: (1) name of Prospective Customer; (2) targeted date(s) for the Broadcast(s); (2)(sic) month the sale is projected to close; (3)(sic) probability of closing the sale; (4)(sic) number of Broadcast ground host partner locations; and (5)(sic) other information as reasonably requested by Velocity from time to time.

C. **Velocity Leads:** If Velocity becomes aware of a Prospective Customer that is within the Market Scope set forth in Exhibit A, section IV while Limited Exclusivity is in force (pursuant to the terms of Exhibit A, section IV), Velocity will promptly notify Reseller and provide Reseller with contact information for such Prospective Customer to facilitate Reseller's marketing efforts with such Prospective Customer.

\* \* \*

---

5. With respect to Velocity's usage guidelines for its trademarks and service marks, Gatzulis testified during his deposition that he did not recall seeing any usage guidelines prior to July 9, 2009, when he received an email from Velocity to which the usage guidelines were attached. (Docket No. 81–2, p. 6 (Depo. pp. 117–20)).

## VII. No Solicitation

... [E]ach party agrees that during the Term of this Agreement and for a period of twelve (12) months thereafter, such party shall not, directly or indirectly: ... (2) solicit for business any Velocity Client, Velocity Business Partner, or client of a Velocity affiliate, as applies to the restriction on Reseller, or any Customer, as applies to the restriction on Velocity, in any way that would be detrimental to the other party or its affiliate; or (3) interfere with any contractual or business relationship (i) as applies to the restriction on Reseller, between Velocity and a Velocity Client or Velocity Business Partner, or between any Velocity affiliate and such affiliate's client or Business Partner; or, (ii) as applies to the restriction on Velocity, between Reseller and a Reseller Customer.[6]

\* \* \*

(Docket No. 90–3, pp. 2–5).

The language in the provision of the second reseller agreement granting limited exclusivity to Celerity, which was set forth under "Market Scope" in Exhibit A to the agreement, differed from the language of the limited exclusivity provision in the parties' initial reseller agreement. Specifically, in the second reseller agreement Velocity agreed "to refrain from entering into any other reseller agreement with any entity for resale of Velocity Services" in the "Pharma Segment," which was defined as "any manufacturers of drugs, medicines or other nonorganic but biologically interactive treatments for humans (e.g., excluding medical devices and biotech/organic treatments)" and "any promotional or educational (IME) programming targeted at physicians, registered nurses or other allied health professionals, clinical investigator or other similar programs and any programs directed toward pharmaceutical or biotechnology company representatives." In the event Celerity met the revenue targets set forth in Exhibit A to the second reseller agreement, Celerity would remain Velocity's exclusive reseller in the "Pharma Segment" through September 30, 2010.[7] (Docket No. 90–3, p. 8, No. 97, ¶¶ 22, 35).

The sample "Velocity Broadcasting Agreement" attached to the second reseller agreement as Exhibit B contained the following provisions regarding payment terms, broadcast cancellation fees and IP rights: [8]

\* \* \*

6. The second reseller agreement defines a Velocity "Business Partner" as "any entity that has an existing contractual relationship, or is in active negotiations, with Velocity, for any purpose other than the purchase of Velocity Services," and a Celerity "Customer" as "an end customer who has purchased and is under contract for Velocity Services from Reseller or any other entity, such as a Medical Communications Company 'MedCom' that has either contracted or subcontracted with Celerity for services that include Velocity Services." (Docket No. 90–3, p. 1).

7. Regarding Celerity's revenue targets, during his deposition, Elias was asked whether he was "satisfied with the amount of money that Velocity made as a result of the [parties']

relationship." In response, he testified: "You know, as far as satisfied, they did not meet their goals in the first Reseller Agreement; they did in their second. So there were parameters built into the contract; they met them. I was satisfied." (Docket No. 74–2, p. 24 (Depo. pp. 89–90)).

8. Celerity did not submit copies of the broadcast agreements signed by its customers to Velocity. (Docket No. 97, ¶ 73). However, pursuant to Section IV.B. of the second reseller agreement, Celerity did provide Velocity with monthly Reseller Forecasts to report which broadcasts were under contract and which were not. (Docket No. 76–1, pp. 2–4, No. 77–1, pp. 2–4, No. 77–2, pp. 2–5, No. 77–3, pp. 2–5, No. 77–4, pp. 2–4).

### 3. *Payment Terms*

You agree to pay the Network Access and Event Management Fee, the Program Production Services Fee, any applicable Optional Services Fees detailed in Exhibit A, and the Hospitality charges (collectively in this section referred to as "Fees") in accordance with the payment schedule below:

 a. Payment Schedule: 35% due upon signature of this Agreement; 35% due thirty (30) days in advance of the Broadcast date; and final 30% due seven (7) days in advance of the Broadcast date.

\* \* \*

### 4. *Cancellation Provisions*

You may cancel a Broadcast at any time, but certain Fees will be due and non-refundable depending upon when you notify Velocity Broadcasting of cancellation. Cancellation Fees are outlined below: [9]

 a. For cancellation less than sixty (60) but at least thirty (30) days in advance of the Broadcast date: 35% of the Network Access and Event Management Fee and the Program Production Services Fee shall be due and non-refundable upon cancellation.

 b. For cancellation less than thirty (30) but at least twenty (20) days in advance of the Broadcast date: 60% of the Network Access and Event Management Fee and the

Program Production Services Fee shall be due and non-refundable upon cancellation.

 c. For cancellation less than twenty (20) days in advance of the Broadcast date: 100% of the Network Access and Event Management Fee and the Program Production Services Fee shall be due and non-refundable upon cancellation.

 d. In addition to the above cancellation fees, you acknowledge and agree to pay the applicable cancellation fees set forth in the [Reservation] Confirmation Letter.

\* \* \*

### 5. *General Terms and Conditions*

 a. Intellectual Property: The Velocity Program that will be produced by Velocity as described in this Agreement will feature your product and/or services information, advertising, promotional content, commercial data, educational materials, research information and/or any other information that you provide to Velocity for use in or with the Velocity Program (collectively "Content"). Velocity recognizes that you have invested considerable resources in your Content—that your Content belongs to you and that you will continue to own all rights, title and interest in and to your Content. Similarly, Velocity will be investing considerable resources and creativity to produce the Velocity Program that

9. Cancellation fees are a common business practice in the hospitality, convention and media industries. During the period that Celerity acted as a reseller of Velocity's broadcast services, Celerity routinely included Velocity's cancellation fees in its contract proposals to, and written broadcast agreements with, customers. There was no provision in the second reseller agreement requiring Velocity to waive the cancellation fees outlined in the Velocity Broadcasting Agreement for a broadcast that was canceled due to the failure of a pharmaceutical company's product to win approval by the United States Food and Drug Administration ("FDA"). In fact, there was no provision in the second reseller agreement addressing the issue of fees in the event a broadcast was canceled. (Docket No. 97, ¶¶ 67–68, 76).

will feature your Content, so Velocity will own all rights, title and interest in and to the Velocity Program, subject to your continuing ownership rights in your Content and the confidentiality provisions of this Agreement.

To facilitate the production of the Velocity Program, you hereby grant Velocity a nonexclusive, non-transferable license to use your Content to produce and broadcast the Velocity Program featuring your Content, perform all of the other Velocity services described in this Agreement, and to copy, edit, reformat, distribute, broadcast and re-broadcast your Content as part of the Velocity Program in whole or in part, and strictly subject to the confidentiality provisions of this Agreement related to your Content.

Velocity may provide to you copies of the Velocity Program featuring your Content on DVD or other media ("Media Copies"). Velocity hereby grants to you a perpetual, royalty-free, non-exclusive, irrevocable right and license to view and display the Media Copies solely within your business organization by employees or contractors of your organization. You may not copy, edit, reformat, distribute, broadcast or rebroadcast any Velocity Program without Velocity's prior written permission in each instance.

All rights not expressly granted in this Agreement are retained by their respective owner.

\* \* \*

(Docket No. 90–3, pp. 10–11, No. 97, ¶ 168).[10]

A sample of the "Reservation Confirmation Letter" referred to in Section 4.d. of the Velocity Broadcasting Agreement was attached to the second reseller agreement as Exhibit C and provided in part:

\* \* \*

Dear [insert client name],

We are pleased to confirm Velocity Broadcasting's reservation of the Private Boardrooms' listed in the attached Private Boardroom List for your upcoming Broadcast event.

\* \* \*

Your reservation will be held for a period of seven (7) calendar days. To firm book this reservation, please remit a $250 non-refundable deposit per Private Boardroom ("Deposit") to Velocity Broadcasting within seven (7) calendar days of the date of this letter. Your remittance of the Deposit will firm book the Private Boardrooms on the Private Boardroom List for your Broadcast event and will indicate your agreement to the terms stated in this letter.

All Deposits are non-cancelable and non-refundable. . . .

\* \* \*

*Next Steps*

Velocity Broadcasting is pleased to offer our private broadcast services to you, and eager to begin planning and producing your Broadcast.

To get us started, we have outlined Next Steps below:

**10.** This IP provision is intended to prevent rebroadcast of programs developed and produced by Velocity without its permission or compensation. (Docket No. 97, ¶ 169). In other words, after the Velocity Broadcasting Agreement attached to the second reseller agreement as Exhibit B became effective, the programs that Velocity produced for private broadcast were no longer "works made for hire." Rather, Velocity retained ownership of the programs and charged end customers a fee to rebroadcast or "repurpose" the programs. (Civil Action No. 09–151, Docket No. 1, ¶¶ 50–52).

- Remit your Deposit and a signed copy of this letter for our records within seven (7) calendar days of the date of this letter to firm book your Broadcast reservation.

- Review and sign the enclosed Velocity Broadcasting Agreement to allow us to begin work for you.

- Velocity Broadcasting will begin planning your Broadcast event upon receipt of a signed copy of the enclosed Velocity Broadcasting Agreement.[11]

\* \* \*

(Docket No. 90–3, pp. 16–17).

Clients of Velocity and its resellers who wish to purchase a private broadcast program commence the process by requesting information regarding studio and restaurant location availability for one or more dates. Velocity's production schedule generally requires 90 days' lead time from the date that tentative search selections are received to the broadcast date. Velocity is limited to conducting one broadcast on any given date due to high production demands. Also, broadcasts of Velocity's programs are rarely scheduled on Mondays and Fridays which narrows the number of available dates. (Docket No. 97, ¶ 62).

### Broadcasts for AstraZeneca in 2008

One of Celerity's customers for Velocity's private broadcast services was AstraZeneca ("AZ"), a pharmaceutical company. On February 4, 2008, Cathy Senko ("Senko"), Velocity's accountant, sent an email to Gatzulis to which she attached an invoice for a Velocity broadcast for AZ that was scheduled for April 23, 2008.[12] In his responsive email, Gatzulis stated, among other things: "Also AZ was quoted a Network Access volume discount of 10% (approved by Philip).[13] The HD rate of $2850 was reduced to $2565. Our invoice from Velocity should total approximately $2180 ($2565 less 15%)[14] per site." (Docket No. 78–5, pp. 3–4).

On February 11, 2008, Katherine Rhea ("Rhea"), Velocity's Earth and Sky Coordinator,[15] sent the following email to Senko regarding her inquiry into Gatzulis's claim of an approved 10% volume discount on network access fees for AZ: "Cathy, Russell has confirmed that this Network Access price change is correct.[16] I have attached the updated billing summary. Please re-invoice them with this corrected amount." The next day, Senko sent an email to Janson and Gatzulis to which she attached a revised invoice for the AZ broadcast scheduled for April 23, 2008,

11. As noted previously, 35% of Velocity's fees for a broadcast were due upon the customer's execution of a Velocity Broadcasting Agreement.

12. Senko is responsible for billing Velocity's clients and resellers for its broadcast services. (Docket No, 78–3, p. 4 (Depo. pp. 8–9)).

13. There is no dispute that the "Philip" to whom Gatzulis refers in this email is Elias.

14. Under the terms of the second reseller agreement, Celerity received a 15% discount on Velocity's network access fees.

15. As Earth and Sky Coordinator, Rhea is responsible for site availability searches and studio and restaurant reservations for Velocity broadcasts. (Docket No. 97, ¶¶ 83–84). Rhea also is responsible for submitting the information necessary for Senko to prepare invoices for Velocity's broadcasts. (Docket No. 78–3, p. 5 (Depo. pp. 10–11)). Rhea's maiden name, "Milliron," appears on some of the documents submitted in support of the parties' respective summary judgment motions. To avoid confusion, the Court will use Rhea's married name throughout this Memorandum Opinion.

16. The "Russell" to whom Rhea refers in this email is Russell Rice, who, as noted in footnote 1, was Velocity's President for a period of time in 2008. (Docket No. 74–2, p. 7 (Depo. p. 24)).

reflecting the 10% discount.[17] (Docket No. 78–5, pp. 2–3).

Eight months later, on October 6, 2008, Janson sent an email to Elias regarding Velocity's invoices for three additional broadcasts that had been conducted for AZ since the April 23, 2008 broadcast, stating:

Philip:

Below is the email exchange with Velocity regarding this years (sic) initial AZ Broadcast (April 23). I have also attached the original and revised invoices from Velocity for your review. This 10% discount was to be applied to all of their 2008 broadcasts per our discussion. In going through subsequent broadcast invoices it appears that we did not catch the 10% discount oversight and thus were charged incorrectly. Only broadcast 1 was revised. Please refer to the attached spreadsheet for the updated correct totals. Let me know how you want to handle the over charge on broadcasts 2 thru 4? (sic) I don't believe we have been invoiced for broadcasts 5 and 6 as of yet. I will be traveling in the morning but available on my mobile from about 12 NOON CT thru the balance of the afternoon.

Regards,

Kurt

(Docket No. 92–4, p. 44, No. 97, ¶ 197).

Elias responded the next day as follows:

Thanks Kurt,

You really need to help me out here. Please send me the e-mail that outlines the specifics of the deal and my confirmation. I have looked and cannot find anything. I have a call into Celia to have her search for any documentation.[18] At this point, we do not have any documentation or action from our part or your part that would trigger a volume discount. I don't even know what the "volume" represents, any milestones that would have to be met or pro rating parameters that we (sic) would have been unequivocally required. Also all the billing (except for one) over that last 9 months has been at the normal rate. We have had no other conversations or correspondence on this topic for AZ or any other one of your clients and none of AZ's broadcasts were booked from a volume perspective.

I think you know my style by now, that these sort of requests go into a business model process, are documented, put through legal (if required) and sent back to you. And you know how painfully long that takes at times. This would have certainly fallen into this category. You guys throw a lot of requests into the game that do not always fit into the rule book. I am very careful to process them diligently and we stand by our decisions. Kurt, I will continue to look for anything that would have detailed the specifics. Until we can validate it; (sic) please consider all billing as stands.

Best Regards,

Philip L. Elias

(Docket No. 92–4, pp. 43–44).

Janson's prompt response stated:

Philip,

This is all I could find. Our April 23 broadcast (AZ 1) imvoice (sic) was re-

---

**17.** With respect to the relationship between Velocity and Celerity at this point in time, on February 15, 2008, Elias sent an email to Gatzulis stating: "We have a great partnership that will go way beyond Pharma. We are the paradigm shift in communications.

Thanks for all (sic) hard work...." (Docket No. 92–3, p. 15).

**18.** The "Celia" to whom Elias refers in this email is Celia Bauer, Esquire, Velocity's counsel. (Docket No. 76–6, p. 13 (Depo., p. 151)).

vised and I am quite sure Cathy didn't do it on her own since I referenced your name. AZ is our only client that a discussion of this nature, between us, took place. I believe you know my "style" as well and I would never offer anything up w/out discussing and attaining (sic) your approval. Speak with who (sic) you must on your side but a quick response on what, if anything, you plan to do would be appreciated. This will allow me to plan accordingly.

Kurt

(Docket No. 92–4, p. 43).[19]

### The Daiichi Sankyo/Effient Broadcasts

One of the medical communications companies to which Celerity sold Velocity's private broadcast services was MediMedia Education Group ("MMEG"). Celerity entered into multiple contracts with MMEG, including a master services agreement and individual agreements relating to specific broadcasts for pharmaceutical companies that MMEG represented. The broadcasting agreements executed by MMEG for Velocity's programs contained the provision pertaining to Velocity's cancellation fees. (Docket No. 97, ¶¶ 77–78, 80).

In May 2008, MMEG advised Celerity that it had entered into a contract with a pharmaceutical company called Daiichi Sankyo, and that Daiichi Sankyo wanted to conduct a broadcast in August 2008 as part of its launch of a new product called Effient.[20] (Docket No. 97, ¶¶ 81–82). On May 5, 2008, an email exchange took place between O'Toole (Celerity's Director of Client Services) and Rhea (Velocity's Earth and Sky Coordinator) in which Rhea was asked to check studio and restaurant availability in August 2008 for the Effient broadcast.[21] Upon receipt, O'Toole forwarded the requested information to MMEG. (Docket No. 97, ¶¶ 87–88).

On June 6, 2008, a non-refundable deposit of $15,250 was paid by MMEG to reserve 61 private dining rooms at various Morton's restaurants on August 19, 2008 for the Effient broadcast. Celerity's contract proposal for the Effient broadcast, which was sent to MMEG on June 18, 2008, contained the provision setting forth Velocity's broadcast cancellation fees. (Docket No. 82–3, p. 4, No. 97, ¶¶ 89–91, 95–96).

After receiving Celerity's contract proposal for the August 19th Effient broadcast, MMEG indicated that it could not sign the broadcast agreement because the IP provision conflicted with the IP provision in MMEG's contract with Daiichi Sankyo.[22] As a result, Celerity requested a modification of the IP provision in Velocity's standard broadcasting agreement to allow Daiichi Sankyo to "repurpose" the content in the Effient broadcast.[23] In re-

**19.** Janson asserts that during a private 10–15 minute discussion with Blias in a conference room in Velocity's offices in early 2008, Elias orally agreed to a 10% volume discount on network access fees for any broadcasts conducted for AZ in 2008. Elias denies this assertion. (Docket No. 97, ¶¶ 197–99, 203). Elias does admit, however, that the 10% volume discount for AZ's network access fees in 2008 was approved by Russell Rice, Velocity's President at the time. (Docket No. 74–4, p. 5 (Depo. pp. 218–19)).

**20.** The initial name assigned to Effient was Pasrugel. (Docket No. 97, ¶ 82).

**21.** O'Toole was involved in managing broadcast logistics for Celerity and frequently interfaced with Rhea. (Docket No. 97, ¶¶ 83–84).

**22.** *See* footnote 10.

**23.** In its brief in opposition to the motion of Velocity and Elias for summary judgment on its counterclaims and third-party claim, Celerity explained the importance of the right to "repurpose" a broadcast as follows: "Because the customers create the content for these broadcasts, (footnote omitted) and because of the significant time and resources

sponse, Velocity agreed to develop pricing for content "repurposing," as well as a rights assignment model.[24] (Docket No. 97, ¶¶ 171, 174–76).

On June 26, 2008, MMEG notified Celerity that FDA approval for Effient had been delayed and, therefore, the Effient broadcast scheduled for August 19, 2008 would have to be postponed. In turn, Celerity notified Velocity of the FDA approval delay and need to reschedule the broadcast. The notification stated: "They understand that their site deposits will be lost." [25] (Docket No. 90–31, p. 2).

The Effient broadcast was rescheduled for October 28, 2008. Rhea discussed the delay in FDA approval with contacts at Morton's who agreed to transfer the deposits that had been paid by MMEG to reserve private dining rooms for the August 19th date to the new date. During this time period, Celerity and MMEG requested a second date for the Effient broadcast. The date selected was December 2, 2008.[26] (Docket No. 90–32, p. 297, ¶¶ 102–03, 105, 107).

On July 21, 2008, Senko (Velocity's accountant) sent an email to Gatzulis to which she attached an invoice for the October 28th Effient broadcast. Senko indicated, among other things, that the deposit paid by MMEG to hold private dining rooms for the August 19th date had been applied to the October 28th date. Shortly after receiving Senko's email, Janson sent an email to Franklin (Velocity's Sr. VP) regarding his receipt of an invoice for the October 28th Effient broadcast before MMEG had signed a contract for the broadcast.[27] Franklin promptly brought "Celerity's issue" with the invoice to the attention of Senko and Rhea. In response, Senko sent the following email to Franklin, Elias and Rhea:

\* \* \*

The invoice clearly states the first payment is not due until the contract is executed regardless of how early we send our invoice. But if this is causing trouble to Celerity, then we can change this.

Who knows when the contracts are executed? Can we add this detail on the

---

customers spend developing each broadcast, they expect to have some rights to re-use the broadcasts in order to earn a return on their investments. Velocity's [IP] terms, however, effectively prohibited the customer from showing the broadcast to the audience for which it was intended after the live broadcast was over." (Docket No. 93, p. 10).

24. According to Celerity, MMEG had purchased Velocity broadcasts when the parties were operating under the initial reseller agreement which did not include the objectionable IP provision. When MMEG realized that Velocity was attempting to limit the customer's repurposing rights, it immediately raised an objection with Celerity. (Docket No. 93, p. 10, fn. 2).

25. These deposits were the private dining room deposits required by Velocity's Reservation Confirmation Letter.

26. A deposit of $24,500 was paid by MMEG on September 19, 2008 to reserve 98 private dining rooms for the Effient broadcast scheduled for December 2nd. (Docket No. 82–3, p. 4).

27. With respect to MMEG's continued failure to sign Celerity's contract proposal for the October 28th Effient broadcast, the issue relating to the IP provision remained unresolved. Velocity and Celerity agree that a steady deterioration in their relationship began at this time and continued through the termination of the second reseller agreement in September 2009.. (Docket No. 97, ¶ 184). As evidence of their deteriorating relationship, Velocity submitted several internal emails between Janson and Gatzulis in which Elias, Franklin and Senko are referred to in vulgar and derogatory terms. (Docket No. 90–50, p. 2, No. 90–51, p. 2, No. 90–52, p. 2).

billing summary so we are all on the same page and send billing to the client at the appropriate time?

(Docket No. 78–6, pp. 3–4).

On July 28, 2008, the following emails were exchanged between Janson and Franklin;

(Janson):

Susie,

I was wondering if any decisions have been made or an eta defined regarding the costs associated with post broadcast repurposing.

\* \* \*

(Franklin):

I brought it up to Philip on Friday and again this morning. I'll try again this afternoon. STUCK!

\* \* \*

(Janson):

I have deals that are at a stand still. I know you know this.

\* \* \*

(Docket No. 92–5, p. 22).[28]

On September 18, 2008, Janson corresponded with Elias regarding MMEG's continuing objection to the IP provision in Celerity's contract proposal for the October 28th Effient broadcast stating:

Philip,

Per our discussion last night I really need to know what you want to do as it pertains the (sic) MMEGs (sic) inability to sign our current contract due to the contracts they have in place with Diachi (sic) and Sanofi.[29] They are requesting that we work off of the old contract for these events allowing them the next few months to revise their contracts carving out satellite broadcasts as "work for hire".[30] As it stands right now these events will not happen unless a compromise is met.

Diachi (sic) has 2–75 site broadcasts on the books and an addition (sic) 75 site event planned for Q1–09. Sanofi will be at a minimum a 50 site event. In total you are looking at 275 sites plus over the next few months ($800,000). Please let me know by late morning tomorrow so that I can put this behind us.

Kurt

(Docket No. 75–9, p. 5).

Elias responded the next morning as follows:

Good Morning Kurt,

We certainly need to figure something out. However, we can not (sic) go back to our old contract. That was set aside and updated about a year ago. We have

**28.** The next day, Gatzulis, who had been copied on the above-quoted emails, sent the following email to Janson: "I want to discuss how we will account for any lost business due to this vis a vis our target numbers. We should not get punished for the inability of others to provide timely answers." (Docket No. 92–5, p. 22).

**29.** The "Sanofi" to which Janson refers in this correspondence is Sanofi Aventis, another pharmaceutical company and potential client of Celerity for a Velocity broadcast. The IP provision in Velocity's standard broadcasting agreement also conflicted with the IP provision in MMEG's agreement with Sanofi Aventis.

**30.** As noted earlier, under the IP provision in the initial reseller agreement, the broadcasts produced by Velocity were designated as "works made for hire." Thus, the broadcasts were owned by the end customers for whom they were produced, not Velocity, and the end customers could repurpose the program for another audience at a later date. In the Velocity Broadcasting Agreement attached to the second reseller agreement as Exhibit B, the IP provision was changed to designate Velocity as the owner of the programs it produces for broadcast. Therefore, an end customer could not repurpose a program without Velocity's consent.

a new rate card in the works that is a pure media model. We could give them early access to that program. That would eliminate any of the work made for hire issues and at the scale of their broadcasts would save them money. I will call you today to discuss.

Best Regards,

Philip L. Elias

(Docket No. 75–9, pp. 4–5).

After responding to Janson's email, Elias spoke with Esswein (Velocity's COO) about the IP issue. In turn, Esswein sent the following email to Franklin on which he copied Elias, Janson and Gatzulis:

Susie,

Philip would like to meet this morning ASAP on the issue of IP language and how it is currently written in our contract.

Please see e-mail below and let me know if you can meet on this first thing this morning. Currently two dates are booked for 2008 that we may lose if contracts are not signed.

(Docket No. 75–9, p. 4).

Franklin responded to Esswein's email (including all of the individuals who had been copied on the email, i.e., Elias, Janson and Gatzulis) as follows: "I have a 9:00 a.m.—can meet at 9:45 a.m. If the e-mail from Kurt means that October 28th is going to free up—my Dallas client wants that date." (Docket No. 75–9, p. 4). A few minutes later, Janson sent the following response to Franklin's email: "It aint (sic) going to free up. I want a solution." (Docket No. 75–9, p. 4). Franklin then sent the following email only to Elias and Esswein: "Isn't that date free—if we don't have payment?" (Docket No. 75–9, p. 4).

On September 29, 2008, Tara Berringer ("Berringer"), MMEG's Director of Client Services, sent an email to Janson on which O'Toole was copied to inform them that Effient did not receive FDA approval the previous Friday as expected. As a result, a postponement of the October 28, 2008 Effient broadcast to mid to late January was requested. As to the December 2, 2008 broadcast for which a non-refundable deposit to reserve private dining rooms had been paid, Berringer indicated that the broadcast was "still on target." (Docket No. 90–34).

In response to Berringer's email, O'Toole promptly sent an email to Rhea on which Elias was copied, stating that Celerity would like to release the October 28, 2008 date for the Effient broadcast due to the continued failure of Effient to receive FDA approval; that Celerity was looking to reschedule the broadcast for mid to late January 2009; and that the broadcast scheduled for December 2nd would move forward as planned. O'Toole also stated: "I know there are a lot of moving parts with this, including contract finalization, but at this time we would like to release October 28." (Docket No. 78–9).

Shortly after receiving O'Toole's email on September 29th, Rhea sent an email to Esswein which stated:

\* \* \*

**Subject: FW: Effient 10.28.08—IMPORTANT**

**Importance:** High

With this cancellation at this point, they are within 65(sic) days of the broadcast but at the 30 day mark, so they should owe 35% of the network access fees contractually.

Would you like me to charge them these or only charge and keep the F & B deposits. (sic)

Just an FYI, the F & B deposits alone total $23,750.

The 35% would total—$67,224.38

Let me know.[31]

(Docket No. 78-9).

O'Toole corresponded with Berringer (MMEG's Director of Client Services) regarding the continued failure of Effient to receive FDA approval late on the afternoon of September 29, 2008, stating in part:

\* \* \*

Thank you for the updates on the Broadcast. As we talked about, I'll wait for your direction on a new date, but know that we are looking at January 13, 20 or 27th as possible alternatives.

\* \* \*

I did have the chance to speak with Kurt [Janson] about the cancellations. He is currently trying to work out any other cancellation (postponement) fees that may be incurred. While no monies have been exchanged,[32] this postponement is occurring within 30 days of the broadcast date. Per the standard Celerity agreement, a cancellation within this time frame is subject to cancellation fees equaling 60% of the total cost. Kurt [Janson] is working toward getting some of the fee's (sic) alleviated or, (sic) applied to the January broadcast. He ex-

pects to be able to give you an answer on the (sic) by the close of business tomorrow.

\* \* \*

(Docket No. 90-34).

The following day, September 30, 2008, Janson sent an email to Berringer to provide "an overview of the financial exposure" facing MMEG's client, Daiichi Sankyo, as a result of the postponement/cancellation of the October 28th Effient broadcast. The purported exposure, which totaled $146,127.50, included (a) $122,377.50 representing the 35% fee applicable when a cancellation occurs within 30 to 60 days of the broadcast date, (b) the $15,250.00 deposit that had been paid to reserve private dining rooms at various Morton's restaurants for the broadcast, and (c) $8,500.00 for deposits that were due and owing for Morton's restaurants that had been added to the broadcast list after the original deposit was paid. (Docket No. 90-34). When Janson sent the September 30, 2008 email to Berringer, Celerity's proposed contract for the Effient broadcast still had not been executed by MMEG due to its continuing objection to the IP provision.[33]

---

**31.** As evidenced by this email, upon notification that the October 28th Effient broadcast would have to be postponed due to a delay in FDA approval, Velocity immediately began internal discussions regarding how much to charge Celerity for the "cancellation" of the broadcast, even though Velocity knew that MMEG had not signed Celerity's proposed contract for the broadcast due to MMEG's objection to the language of Velocity's IP provision. (Docket No. 96, ¶ 29).

**32.** As noted previously, 35% of Velocity's fees to produce a private broadcast are due at the time a customer executes a Velocity Broadcasting Agreement. Because MMEG had not executed the broadcast agreement proposed by Celerity, no payment had been made.

**33.** With respect to the purpose of this email to Berringer regarding the "financial exposure" of Daiichi Sankyo despite the absence of a signed broadcast agreement, Janson testified during his deposition as follows:

\* \* \*

Q. So what did you mean when you said I'm sorry to hear about the delay and hope the PDA can expedite their review and subsequent approval. Below I have provided an overview of the financial exposure for your client as it relates to our services and cancellation of this 10-28-08 broadcast?

\* \* \*

A. Well, in the process of selling anything, and especially given the time that we worked on this in trying to get through the IP issues and some of the other stuff, I used

On October 3, 2008, Rhea sent Janson an email which stated in relevant part:

Hi Kurt,

Please find an outline below of the cancellation details that we discussed yesterday afternoon:

Daiichi/Effient—10/28/08

Plan A—Cancellation Fees

— Cancelled 9/29/08 (30 days prior to the broadcast)

— 35% of Velocity's Fees Due: $83,208.13

— 90% of F & B Revenue Minimums Due: $134,000 [34]

— 100% of F & B Deposits Due: $23,750

— Less Deposits already paid: $15,250.00

— _____

— Balance due: $225,708.13

Plan B—Provisions and Cancellation Fees

— Must Re-Schedule broadcast for a date prior to January 31, 2008(sic). Must use before this 1/31/08 (sic) or full broadcast fees will be owed: $381,487.50

— Full payment of current broadcast must be paid on or before the original schedule date of October 28, 2008. This total amount · is $381,487.50

— Must pay remaining F & B deposit balance dues $8500 due to additional 35 boardrooms after the original deposit transaction

\* \* \*

(Docket No. 90–35).

On October 6, 2008, Janson sent an email to Jeff Keller of MMEG regarding the cancellation details for the Effient

any and all techniques to try to get them to elevate the discussions on our end and hopefully come to some resolution to get the contract signed. Again, there was never a contract signed. And Jeff Keller, the vice-president of MMEG, made me well aware of that. So all I was trying to do with this is trying to elevate and to show them what their financial exposure was. Whether or not it was applicable or whether or not there was a contract to it, it was not even relevant. I'm just working along with what I have available to me to try to get it expedited. Possibly get them in a position to want to move so that they wouldn't be exposed.

\* \* \*

Q. Isn't it true, Mr. Janson, that you're asserting that either MMEG or its client might be required to pay cancellation or postponement fees relating to this broadcast postponement?

A. I'm not asserting that, Miss Scheib. What I was not going to do was tell them that, hey, you canceled this, but, by the way, don't worry about it, there's not a contract in place. We had spent a lot of

time on this. What (sic) I say we, we meaning Velocity and Celerity. That's we. Trying to get this done, trying to work through the issues that MMEG had with their master of (sic) services agreement. So all I did was, and my intent behind this E-mail was lay out financial exposure, whether that was real or fictitious, I can't-you know, that's what I did to try to get that-push the business along and try to get them to understand that we needed to get this thing done. By no means am I telling them that they're going to be responsible for this.

(Docket No. 81–9, pp. 7–8 (Depo. pp. 124–26)).

**34.** Velocity's hospitality partners, Morton's and Maggiano's, set a food and beverage ("F & B") revenue minimum that was required to be spent in connection with the use of a particular private dining room for a Velocity broadcast. In the event of a late broadcast cancellation, Morton's and Maggiano's were entitled to recover the F & B revenue minimums established for the private dining rooms that had been reserved. (Docket No. 83, p 15, n. 6).

broadcast that had been scheduled for October 28, 2008. The email stated:

Jeff,

Per our discussion on Friday I am providing you with an overview of what we can offer you/your client (Daichi–Sankyo) (sic) and their need to postpone the 10–18–08(sic) broadcast

*Established SOW*

79 sites ($225,150)

95 Boardrooms

Production ($117,000)

F· & B Estimate ($197,500) 1975 attendees @ $100 per

F & B coordination ($7500)

Misc Exp ($5000)

Estimated Total = $552,150

Deposits Paid ($15,250)

Deposits Owed ($8500)

*Terms*

1. Must reschedule and execute this broadcast by January 31, 2009.

2. Full payment ($552,150) must be paid prior to original date of 10–28–08

3. Outstanding site deposit of $8500 must be paid prior to original broadcast date of 10–18–08(sic)

4. 10% postponement fee on Network Access, Production and F & B Coordination will apply and must be paid prior to original broadcast date of 10–28–08

($34,965) a. Total due Celerity prior to 10–28–08 ($596,615)

Please call me to discuss and establish a timeline acceptable to all parties.

Kurt (Docket No. 90–36).

On October 20, 2008, Celerity advised Velocity that the Effient broadcast scheduled for December 2, 2008 also was being cancelled.[35] (Docket No. 97, ¶ 113). Two weeks later, Emily Stuart, Maggiano's National Sales Manager, sent an email to Rhea to which an invoice was attached for the cancellation of the second Effient broadcast. The total of the invoice was $5,250, representing the $250 non-refundable deposits that had been paid by MMEG to reserve private dining rooms for the broadcast at 21 Maggiano's restaurants. (Docket No. 78–8). In a Reseller Quarterly Forecast completed for Velocity on November 5, 2008, Celerity described the status of the Effient broadcasts as "pending contract signature." [36] (Docket No. 77–4, p. 3).

The issue arising out of the IP provision in Velocity's standard broadcasting agreement remained unresolved as of November 19, 2008, when Janson sent the following email to Franklin: [37]

Susie,

I just got an email from MMEG that the IP language is still with legal. As we discussed this morning, I have never spoken for Philip and/or Velocity and

---

**35.** Subsequently, Celerity sold a Velocity program to another customer that was broadcast on December 2, 2008. (Docket No. 98–7, p. 2).

**36.** Celerity provided additional Reseller Quarterly Forecasts to Velocity on January 14, 2009, March 2, 2009, April 1, 2009 and May 1, 2009. In all of the forecasts, the Effient broadcasts continued to be described as "pending contract signature." (Docket No. 76–1, p. 3, No. 77–1, p. 3, No. 77–2, p. 2, No. 77–3, p. 3).

**37.** Approximately two weeks before this email, Morton's inadvertently forwarded a broadcast proposal prepared by Celerity to Franklin which showed that Celerity's production fee for a Velocity broadcast was $120,000.00. (Docket No. 92–4, p. 41). Apparently, prior to receiving this broadcast proposal, Velocity was not aware of Celerity's production fee. (Docket No. 93, p. 7).

certainly would not do so in this situation. Since the MMEG IP revisions are still with legal I would suggest that we all get on a call to discuss where we are at and more importantly which direction we want to go in. I can provide the velocity (sic) team with an update and a recommendation. In the end, it really is Philips (sic) decision and hinges on how he/Velocity wants to handle any further changes in the IP language. Celerity will support him and velocity (sic) in any decision that is made on the subject. Let me know if we can get on a call later this afternoon or tomorrow.

Regards,

Kurt

(Docket No. 77–5, p. 2).[38]

Later that day, Janson reported to Franklin that he still had not heard from MMEG regarding their proposed revisions to the IP language in Velocity's standard broadcast agreement. (Docket No. 92–6, p. 17). Elias, to whom Janson's email had been forwarded, sent the following email to Franklin:

Hi Susie,

Please let Kurt know (and perhaps you have already) that this issue has nothing to do with cancelling the broadcasts and the fees for postponement or cancellation that are due. I also don't believe that we are going to move from the addendum that Celia penned and I submitted to Kurt.

Best regards,

Philip L. Elias

(Docket No. 92–6, p. 17).

Thereafter, MMEG provided Celerity and Velocity with its proposed revisions to the IP language in Velocity's standard broadcast agreement. On November 22, 2008, Franklin informed Janson that MMEG's proposed revisions were "not within VELOCITY'S parameters." Two days later, Janson informed Franklin that he had notified MMEG that its revisions to the IP language and cancellation terms for the Effient broadcasts were not acceptable to Velocity. (Docket No. 92–5, p. 13).

On December 2, 2008, Velocity sent an invoice to Celerity for $225,708.13 in cancellation fees for the October 28th Effient broadcast and $228,093.13 in cancellation fees for the December 2nd Effient broadcast. The cancellation fees for the first Effient broadcast included (a) $83,208.13 representing 35% of Velocity's fees, (b) $134,000.00 representing 90% of the F & B revenue minimums, and (c) $8,500.00 representing the unpaid private dining room deposits. The cancellation fees for the second Effient broadcast included (a) $81,843.13 representing 35% of Velocity's fees, (b) $146,000.00 representing 90% of the F & B revenue minimums, and (c) $250.00 representing an unpaid private dining room deposit.[39] Celerity did not pay the invoice. (Docket No. 79–2, pp. 2–4, No. 97, ¶¶ 115–16).

Two weeks later, Velocity sent formal notice to Celerity that it was in material breach of the second reseller agreement for failing to pay the cancellation fees for the Effient broadcasts. Despite receiving

---

**38.** In response to this email, Franklin informed Janson that Velocity would need MMEG's proposed IP revisions in writing before a conference call was scheduled. (Docket No. 77–5, p. 2).

**39.** There is no evidence that either Morton's or Maggiano's charged Velocity for the F & B revenue minimums applicable to the Effient broadcasts. Nevertheless, the F & B revenue minimums were included in the invoice sent to Celerity by Velocity. (Docket No. 96, ¶ 33).

the notice, Celerity did not pay the cancellation fees. (Docket No. 97, ¶¶ 122–24).

On January 14, 2009, Janson informed Elizabeth Surgil ("Surgil"), one of Velocity's Producers, by email that Effient was scheduled to go before the FDA Advisory Committee for review on February 3, 2009; that full approval of Effient was expected in early March 2009; that MMEG was still interested in working with Celerity on two Effient broadcasts in the summer of 2009; that MMEG's client, Daiichi Sankyo, was committed to repurposing the content of the broadcasts; and that MMEG had begun to investigate other broadcast options, although its first choice was to work with Celerity if Velocity changed its position of the IP language. Janson then asked Surgil to notify him of Velocity's position on the IP language "given these latest developments." (Docket No. 92–5, p. 19).

On January 23, 2009, Jeff Keller of MMEG sent an email to Janson requesting an update on Velocity's position regarding the IP provision in its standard broadcast agreement. The email stated: "We have to get an answer to 2 different customers today regarding repurposing the satellite b-casts. They consider the content work for hire as do their legal folks, it's a deal breaker." (Docket No. 92–5, p. 16).

### Reseller Agreement with Maritz

In the summer of 2008, Maritz expressed an interest in selling Velocity broadcasts. A meeting was held on June 17, 2008, to discuss the proposed partnership. Elias, Esswein and Franklin represented Velocity at the meeting, and Steve O'Malley ("O'Malley") represented Maritz. In his record of the meeting, O'Malley noted, among other things, that Celerity was the only reseller of Velocity broadcasts at that time; that Celerity "own[ed] the pharma space;" that all other "verticals" were open; and that Velocity was interested in Maritz serving as a reseller in the financial services and automotive verticals. (Docket No. 92–3, p. 20).

On September 10, 2008, Velocity entered into a reseller agreement with Maritz which granted Maritz the right to sell Velocity's broadcasts to any sector but the pharma sector in which Celerity had exclusivity. (Docket No. 76–6, p. 13 (Depo., pp. 149–50), No. 92–4, p. 2).

On November 24, 2008, O'Malley sent an email to Franklin expressing Maritz's desire to serve as a reseller of Velocity's broadcasts in the pharma sector. Shortly thereafter, O'Malley provided Franklin with the entire list of Maritz's customers in the pharma sector. In response, Franklin sent a "representative listing" of Velocity's pharma clients adding: "Our exchange is totally confidential at this point—keep close." (Docket No. 92–3, p. 22).

On March 17, 2009, Franklin sent the following email to O'Malley:

Glad that we had the call—I am not so sure that "we can make it work" as Jeff mentioned today re: Maritz pursuing or providing pharma leads unless Celerity is involved in some way.

From my view—it would be a requirement to involve Celerity. Perhaps that can be done in a way beneficial to all. I will discuss with Celia.

O'Malley responded as follows:

Thanks for pushing on this, Susie. We do see that we will routinely run into these opportunities, especially now that we've launched Velocity to our sales force. If there is a way that we can bring these opportunities to Velocity in a beneficial way to all involved, that would be great.

(Docket No. 92–4, p. 30).[40]

On March 23, 2009, O'Malley sent the following email to Franklin:

> I know we have sent off some list (sic) of targets to you. Could we also get a list of the clients that Celerity has already concluded business with so we know who specifically that we do business with that we can't sell to?

The next day, Franklin sent the following responsive email to O'Malleys

> At this juncture, you cannot sell into Pharma at all—per the contract language that I provided. I can give you a list of the pharma companies that have done a VELOCITY broadcast through Celerity. Medical Device is wide open....

(Docket No. 92–4, p. 27).

The same day, Franklin requested a list of all Velocity pharma clients by company and drug name from Rhea. She then sent the list and the following email to O'Malley:

> The attached pharmaceutical client listing is provided to you confidentially for reference only. All clients on the listing were brought to us by our reseller-except St. Jude Medical.[41]

(Docket No. 92–4, pp. 32–34).

Currently, Maritz is a non-exclusive reseller of Velocity broadcasts in the pharma sector. (Docket No. 74–3, p. 19 (Depo. pp. 173–74)).

### Velocity's Brand Usage Guidelines

In late 2006 or early 2007, Janson created a document for marketing purposes to describe the services provided by Velocity and Celerity. In discussing the communications platform offered by Celerity in concert with Velocity, the "Overview" refers to the "Celerity–Velocity HD Suites," the "Celerity–Velocity solution," and a "Celeri-

---

**40.** With respect to the discussions taking place between Velocity and Maritz concerning the ability of Maritz to sell Velocity broadcasts in the pharma sector, a declaration of Janson dated March 18, 2011 states: "In approximately August 2008, Elias told me that if he had the ability to go back in time, he would have entered into a reseller agreement with a company with 'more feet on the street' (i.e., a large company like Maritz) rather than a four-person company like Celerity." (Document No. 92–4, p. 37). Elias does not recall making this statement. (Docket No. 74–3, p. 19 (Depo. p. 174)). In its amended answer and counterclaims, Celerity alleges that in response to Elias's statement regarding his desire for a larger company to serve as Velocity's reseller in the pharma sector, Celerity offered to investigate the transfer of a controlling interest in Celerity to Maritz or another larger reseller "in order to monetize the significant investment that the principals had made in building Celerity." Celerity further alleged that Elias stated that such a transaction would not be in Velocity's best interest and demanded that Celerity not pursue it. (Docket no. 23, p. 15, ¶¶ 29–31).

**41.** The list included the following pharmaceutical companies with the subject of the broadcast(s) produced by Velocity in parentheses: (1) Abbot (Simcor); (2) Astellas (Vesicare); (3) AstraZeneca (Symbicort); (4) Bioform (facial rejuvenation); (5) Boehringer Ingelheim (Aptivus); (6) Bristol Myers Squibb (Abilify); (7) Celgene (Revlimid and Vidaza); (8) Cephalon (Treanda and Provigil); (9) CIBA (vision); (10) Daiichi Sankyo (Effient); (11) Eli Lilly (Byetta and Cialis); (12) Endo (Voltaren); (13) Genentech (Tarceva); (14) GlaxoSmithKline (Vesicare and Lamictal); (15) Johnson & Johnson (Doripenum); (16) King (Avinza); (17) Novartis (Focalin and Enablex); (18) NovoNordisk (WDD); (19) OrthoMcNeil (Levoquin and Concerta) (20) PER (oncology); (21) Sanofi Aventis (Taxotere); (22) Sepracor (Brovana); (23) Shire (Vyvanse); (24) St. Jude Medical (atrial fibrulation); (25) Takeda (Rozerem, Actos and Amatiza); (26) The Chatham Institute (Dislypedemia); and (27) UCB (Cimzia). (Docket No, 92–4, p. 34).

ty–Velocity broadcast." (Docket No. 81–6, pp. 7–8).

The 2008 version of the usage guidelines for Velocity's brand, which Celerity denies receiving until July 9, 2009,[42] stated that "[a]s the [Velocity] brand rapidly expands ... it is critical that its positioning, messaging and brand image be maintained uniformly and consistently across the spectrum," and that "[a]ll communications, correspondence and collateral materials, whether they originate with VELOCITY or not, should adhere strictly to the standards." (Docket No, 90–5, pp. 2–25, No. 97, ¶¶ 128–30).

On December 22, 2008, Velocity sent notice to Celerity that distribution of the "Overview" was a material breach of the provision in the second reseller agreement regarding Celerity's limited license to use Velocity's trademarks and service marks for marketing activities and demanded that Celerity cure the breach. (Docket No. 81–6, No. 97, ¶¶ 132, 134, 140). Despite the foregoing notice, on March 10, 2009, Gatzulis sent Celerity's "Overview" to Ivan Nelson of Sanofi Aventis, a pharmaceutical company that was interested in purchasing a private broadcast produced by Velocity. (Docket No. 97, ¶ 145).

### The Sepracor/Brovana Broadcast Cancellation

During Celerity's term as a reseller for Velocity, Celerity sold a broadcast for a product called Brovana to HealthLogix, a medical communications company that represented Sepracor, the manufacturer of Brovana. A broadcasting agreement for the Brovana broadcast was executed by Celerity and HealthLogix on November 5, 2008.

On January 13, 2009, the Brovana broadcast, which had been scheduled for February 26, 2009, was cancelled for budgetary reasons. Two days later, Rhea sent the following email to Janson:

Hello Kurt,

Here are the 2/26 Brovana cancellation details. Because this cancellation is due to a budget cut, and not an fda (sic) approval issue, our standard cancellation policies will apply. However, if Brovana does decide to re-book in 2009 Velocity is willing to keep an open mind.

Senko attached a revised invoice for the Brovana broadcast cancellation fees to an email to Gatzulis on January 26, 2009. The cancellation fees, which totaled $145,648.38, were paid by Celerity.[43] (Docket No. 79–3, pp. 2–7, No. 82–1, pp. 7–16, No. 97, ¶¶ 117–19).

### The Enablex Broadcast in Blue Bell, Pennsylvania

On May 28, 2009, Velocity produced an off-site broadcast for one of Celerity's customers for a product called Enablex during which the audience response system ("ARS") failed.[44] The next day, Janson

---

42. See footnote 5.

43. In opposition to Celerity's motion for summary judgment and in support of its cross-motion for summary judgment on the claim that Celerity is liable for cancellation fees for the Effient broadcasts, Velocity places great weight on Celerity's payment of the cancellation fees for the Brovana broadcast that had been scheduled for February 26, 2009. Velocity fails, however, to acknowledge the significant difference between the Brovana broadcast and the Effient broadcasts, i.e., the execution of a broadcasting agreement for the Brovana broadcast prior to its cancellation. Moreover, as noted by Rhea in her January 15, 2009 email, the Brovana cancellation was due to a budget cut, not a delay in FDA approval. Thus, Velocity's standard cancellation policies applied.

44. The Enablex broadcast was produced in Blue Bell, Pennsylvania, rather than the Pittsburgh studio normally used by Velocity to produce its broadcasts. (Docket No. 81–11, p. 2 (Depo. p. 286)).

sent an email to Surgil (a Velocity Producer) which stated in part:

Elizabeth,

I write as principal of both Celerity Healthcare Solutions, Inc. ("Celerity") and Therapeutic Decisions in Medicine, LLC ("TDIM") to advise you of some serious concerns we have regarding last night's Enablex broadcast.[45]

As you are well aware, ARS failed across the board last night. Needless to say, we are embarrassed and disappointed because of velocity's (sic) failures. At this time, our investigation has begun regarding the cause of the ARS failure. Both our primary and backup computers are being analyzed. One important point, however, is that the backup computer appears to be damaged as a result of shipment via Federal Express. A major part of your rationale for the extra cost of the private jet was that the equipment would be delivered safely and promptly. Now, we find out that the ARS computers were shipped via FedEx? Celerity acquiesced to the charges for private jet service predicated upon these discussions. As we have retained the shipping labels from FedEx, Celerity has been overcharged and had an important part of the broadcast ruined as a result of Velocity's actions. Another important point involves the $12,500 R & D and configuration charges to TDIM. Apparently, these activities didn't begin until a day prior to the broadcast. In fact, Leon made a comment that the set up was exactly the same as the studio in Pittsburgh. Celerity's position is that the additional R & D and configuration charges, in addition to being a complete failure, are suspect to say the least.

\* \* \*

As a result of last nights (sic) debacle, TDIM has been left with no other choice but to issue stop payment orders for the approximately $21,000 in checks that we have forwarded to you for the ARS portion of this broadcast.[46] Quite frankly, we question whether any monies are due to Velocity as a result of the ARS failure. We will continue to keep you in the loop as our investigation unfolds.

Regards,

Kurt

(Docket No. 92–6, p. 82).

Esswein (Velocity's COO) responded to Janson's email by letter, stating in part:

Dear Kurt—

I am in receipt of your most recent e-mail which you sent to Elizabeth Surgill (sic) on Friday, May 29th, 2009. This e-mail once again shows typical Celerity style which is not only off base, inaccurate and accusatory but does not contain one valid statement. Your approach to this e-mail is symbolic of why Celerity and VELOCITY are in the current state of affairs.

It is clear that the ARS portion of the Enablex Broadcast failed; however, it is not clear the cause of the failure at this time. I do know, from our VELOCITY Team and the ISP Company, the set-up and backbone were enabled and operational as specified and promised. Before you jump to conclusions and blame the entire failure on VELOCITY it

---

**45.** TDIM was a company started by Janson and Gatzulis to provide audience response pooling capabilities during Velocity broadcasts. (Docket No. 81–1, p. 8 (Depo. p. 26)).

**46.** The $21,000 in checks on which payment was stopped included the $12,500 charged by Velocity for R & D and configuration services and the handset commission due to Velocity for the ARS services. (Docket No. 81–10, p. 23 No. 81–11, p. 3 (Depo. pp. 280, 292–93)).

would be advantageous for you to have all of the facts.[47]

Campus your ARS provider, selected the carrier and sent VELOCITY the Federal Express mailing labels; so this should have been no surprise to you. The computers were never being sent via jet service with the VELOCITY team.

VELOCITY will provide a detailed incident report between all parties involved with specific logistical information from Debbie Minor and Campus as well as all logs of specific connectivity report from the Internet Service Provider. I would suggest that Celerity provided a detailed incident report.

Kurt, as you are aware this is not the first time that your ARS system has failed during an off campus broadcast as well as productions generated out of the VELOCITY studios.

Please note:

As of June 1, 2009 the TDIM ARS system will no longer be available as part of any broadcast. We are in the process of notifying our clients; I suggest you notify Celerity clients immediately. Please cc VELOCITY on all correspondence to this regard. If your clients would still like to use an ARS system; (sic) a new, more advanced and stable system will be available shortly. Details and pricing will be provided.[48]

\* \* \*

. Regards,

Jeffrey P. Esswein

(Docket No. 92–6, pp. 79–80).

### *Proposed Broadcasts for AZ in 2009*

On September 30, 2008, Esswein sent an email to Janson which stated in part:

Kurt—

Philip just gave me a call and said that you were putting together a proposal for AZ for 2009. I have included a copy of our new rate card in an electronic PDF format. This will allow you to price any future and long term business opportunities appropriately with AZ. . . .

This new rate card and its pricing will go into effect October 1, 2008 but if you have any pending contracts that are on the table for 2008/2009 and you close them prior to October 31st, 2008 the old rates will be applicable. If you have any questions in reference to this rate card please don't hesitate to give me a call. . . .

Thanks, Jeff

(Docket No. 92–5, p. 36).

On January 2, 2009, Surgil (a Velocity Producer) informed Janson by email that Velocity would have a proposal for AZ's 8–broadcast package by the end of the following week, and that Velocity would hold the $2850 network access rate specifically for AZ until the end of January if they decide to move forward and book their 2009 broadcasts. (Docket No. 92–5, p. 42). Three days later, Surgil confirmed with

---

**47.** With regard to his understanding of the cause of the ARS failure during the Enablex broadcast, Janson testified during his deposition as follows:

\* \* \*

Q. How do you know that ARS didn't fail because of some flaw in the Audience Response System software or the bay stations owned by TDIM?

A. I was told that everything was checked out. It was an Internet connectivity issue. That's what I know.

\* \* \*

(Docket No. 81–11, p. 4 (Depo. p. 293)).

**48.** TDIM ceased business operations after Velocity's notification that it would no longer use TDIM's services to provide audience response capabilities for its broadcasts. (Docket No. 81–1, p. 8 (Depo. p. 27)).

Janson by email that Velocity would hold the $2850 network access rate specifically for AZ until the end of January, and would have a proposal with regard to AZ's broadcast repurposing requests by the end of the week. (Docket No. 92–5, p. 41). Several hours later, Janson informed Surgil that AZ had called and emailed that morning regarding their immediate need to know Velocity's position on the IP issue, noting that Esswein had verbally committed to having a repurposing proposal for AZ by that day and that time was of the essence because an AZ broadcast was proposed for February 2009. Janson also informed Surgil that AZ had requested a conference call with Celerity and Velocity that afternoon. (Docket No. 92–5, p. 41).

The next day, January 6, 2009, Surgil emailed Elias, Esswein and Franklin to recap the discussion that had taken place the previous day with AZ. Surgil noted that she updated AZ with respect to the extension of the network access fee of $2850 and informed AZ that although the January 5th deadline for the repurposing proposal would not be met, AZ would receive the proposal by January 9, 2009, Surgil then stated:

\*　　\*　　\*

As it stands right now we are in jeopardy of losing 2 broadcasts (Symbicort and Serequel) due to the delay in getting the IP issue resolved. They (AZ) were very disappointed at velocity's (sic) inability to meet a deadline that was committed to by Jeff Esswein on December 23, 2008 and that no one from velocity (sic) was able to join us on the call today to explain why the January 5, 2009 committed date was not met. It was said more than once that they feel as though velocity (sic) does not understand the pharmaceutical market and that velocity (sic) is taking their (AZ's) business for granted. They also wanted me to let you know that they don't quite understand why a "proposal" from velocity (sic) is necessary as it pertains to their request. They stated that they "were very clear" with what they needed in order to move forward.

It is imperative that a decision is made on the subject and provided to AZ for comment immediately.

\*　　\*　　\*

(Docket No. 92–5, p. 59).

On January 9, 2009, Surgil attached Velocity's repurposing proposal for AZ to an email to Janson which provided in relevant part:

VELOCITY Broadcasting offers AstraZeneca a special promotional re-purpose program for its April 2009 broadcast per our conference call on January 16, 2009 the parameters are as follows:

AstraZeneca April 2009 Broadcast

— Network Access Fee $3450.00 per site

— Production fee: $59,500.00 per broadcast

— 50 site minimum

— Broadcast dates are subject to availability and must be booked in advanced to assure desired dates

AstraZeneca April 2009 Re–Purpose Rights Parameters:

— One Year Non–Air Unlimited Use

— $20,000 dollars

(Docket No. 92–5, p. 9).

Janson requested the foregoing proposal for AZ in the form of a legal document. In an email to Janson on January 23, 2009, Surgil stated: "I spoke to Philip and Jeff and they both agree with the language currently on this proposal. It states everything that Eric Anderson of AZ agreed to on our call on 1/16 and is very specific in reference to the one year non-air unlimited

use for their April broadcast at $20,000. Please use this document for AZ." (Docket No. 92–5, p. 57). In his responsive email, Janson stated: "This isn't exactly what I was looking for as this will be going into AZ legal. That said, please have Philip add his signature and send it back to me." [49] (Docket No. 92–5, p. 57).

On February 9, 2009, Janson sent an email to Surgil stating:

Can you please provide me with an update on when I might expect the legal language for the AZ—April 16, 2009 broadcast as it relates the agreed upon repurposing scope and fee. As you can read below I was to have it by Wednesday, January 28, 2009. Without this a contract cannot be reviewed, a PSA created, reviewed, executed, a PO# assigned and ultimately an invoice for payment generated. This broadcast is fast approaching so your immediate attention to this is necessary.

(Docket No. 92–5, p. 50).

On February 11, 2009, Janson sent another email to Surgil stating: "Yesterday came and went with nothing from velocity (sic) as it pertains to AZ's ability to repurpose their content within the agreed upon conditions. Without this document from velocity (sic) we are unable to execute the PSA. Please let me know when I might expect to have this so that I can let AZ know." [50] (Docket No. 92–5, p. 50). Several hours later, Georgiean Geanopulos ("Geanopulos") of AZ sent an email to Janson noting that AZ "ha[d] been issued a 'no price increase' order." She then stated: "I shared with our leadership team

that Velocity has increased the network access fee and now has a repurposing fee for 2009. Additionally, I shared that Velocity has not responded to our repeated requests for a breakdown and explanation for the increase in the Network Access Fee. The AZ Procurement Leadership team, has now asked for a breakdown for the repurposing fee as well as the broadcast fee in terms of actual media time, people's hours etc." Geanopulos's email was forwarded by Janson to Surgil requesting a date by which Velocity would provide the additional information for AZ. (Docket No. 92–5, p. 48).

On February 17, 2009, Janson inquired yet again of the status of the "necessary legal language from velocity (sic) as it pertains to AstraZeneca's ability to repurpose their broadcast," noting that he had been compelled "to field numerous calls from AstraZeneca regarding its whereabouts." Janson also noted that without the language from Velocity, execution of a broadcast agreement with AZ was impossible. Finally, Janson indicated that AZ had requested a conference call in the next 24–48 hours to discuss the delay in the legal language for repurposing and an explanation for the 2009 increase in network access fees. (Docket No. 92–5, p. 44).

The next day, Surgil sent the following email to Janson:

Kurt,

Thank you. We certainly appreciate you closing the loop on the AZ contract. However, the confusion and persistence on the detailed language in the form of a legal document requested from Celerity

---

**49.** Around this time, Celerity lost the sale of a broadcast to a pharmaceutical company called Avanstar due to Velocity's position with regard to repurposing. In an email to Janson on January 12, 2009, the client stated: "Sorry this couldn't work out but clearly Velocity has a lot to learn about working in the pharma-

ceutical industry. Please keep in touch as they realize they are turning away business with this policy." (Docket No. 92–5, p. 24).

**50.** Surgil responded: "I will let you know ASAP......" (Docket No. 92–5, p. 44).

is perplexing considering our contract is with you. The language I referred to (from legal) was only to provide additional detail to the Re–Use Rate Card. We have never had a contract direct (sic) with any of Celerity's clients and if this is what is being requested then we will need to have one drafted appropriately through our legal team which would have to be inclusive of an entire VBA contract.

If you need to add an addendum to your contract with AZ then it should be drafted through your legal team and should be no different than any other rate card item. I have attached our proposal with the definition of "one year non-aired unlimited use content" for your convenience.

As for the rate increase of $2850 vs. $3450 we have not only explained this but also included the published rate cards and highlighted the difference in rates. I would think as our re-seller you would be able to articulate these increases to your client in a positive light with the value added components. Remember these rates have been published since last September and went into effect in October. Jeff's email certainly provided enough detail on the increase of our rates.

That said; (sic) we would be happy to participate in a conference call. . . .

(Docket No. 92–5, p. 53).

A conference call was held on February 19, 2009 regarding clarification of the terms of Velocity's repurposing fee. Esswein participated on Velocity's behalf in the call. Three days later, Esswein sent the following email to Geanopulos of AZ:

Georgiean—

Thanks for the follow-up email. The definition of an "aired event" is the following and any aired event is excluded from your re-purposing rights: Webcasting, Pod-casting, and Broadcasting.

AstraZeneca's repurposing rights for one year will include DVD private distribution, DVD public distribution, Lunch and Learns as well you can certainly put the program on your web-site via on-demand streaming including entire or partial content.

\*　　\*　　\*

(Docket No. 92–5, p. 61).[51]

On May 5, 2009, Janson received the following email from Franklin (Velocity's Sr. VP):

Hi Kurt:

In reviewing Celerity's monthly reporting, it appears that A/Z is no longer a Celerity client. Is that an accurate assumption by me/velocity? *Lost to a competitor* has that connotation—want to clarify if that is the case. There is no activity or ongoing conversations between A/Z and Celerity related to commitments to VELOCITY broadcasts? Or . . ."

If VELOCITY and Celerity are no longer the vendors of choice, do you know who A/Z has chosen and the reason(s)? We know that A/Z had a very strong

---

51. Around this time, Velocity quoted a broadcast repurposing fee of $54,000 for a potential client of Celerity for a product called Voltaren Gel. In an email to the client on February 26, 2009, a representative of Celerity indicated that an explanation of the high repurposing fee had been requested from Velocity. (Docket No. 92–51, p. 30). Approximately 5 ½ months later, Velocity quoted a repurposing fee of $15,000 for 6 months and $5,000 per month thereafter for a Celerity customer for a product called Embryon. In response to the quote, Janson sent an email to Surgil which stated: "It looks like Velocity is getting less expensive as it relates to our clients being able to repurpose their content," (Docket No. 92–5, p. 32).

connection and satisfaction with VE-LOCITY. In fact, remarks were made to that effect during A/Z's most recent broadcast. The collapse of this relationship is of great concern here.

I know that I asked you about A/Z by phone a while back, but further clarification is needed here.

Thanks

Susie

(Docket No. 92–5, p. 65).

Janson responded later that day as follows:

Susie

I just landed and saw this. In light of the allegations of our cross claim and the third party claim, as well as all of the e-mails exchanged regarding AZ; (sic) I find it amazing that I am receiving such an inquiry. You know as well as I do that Velocity's pricing tactics, inability to finalize intellectual property issues and general intransigence caused AZ to seek other options.

(Docket No. 92–5, p. 64).

In response to Franklin's subsequent inquiry into whether AZ had terminated its relationship with Celerity, Janson directed her to speak with Celerity's counsel. (Docket No. 92–5, p. 64).

### Commencement of Litigation

On January 28, 2009, Velocity filed this civil action against Celerity (a) asserting a claim for breach of contract based on Celerity's failure to pay the cancellation fees invoiced for the Effient broadcasts, and (b) seeking a declaratory judgment that Celerity's failure to pay the cancellation fees

was a material breach of the second reseller agreement entitling Velocity to terminate the agreement. (Docket No. 1).

Nine days later, Velocity filed Civil Action No. 09–151 against Celerity (a) asserting claims for trademark infringement, unfair competition, breach of contract based on Celerity's alleged violation of Velocity's brand usage guidelines and breach of contract based on Celerity's alleged violation of the non-solicitation provision in the second reseller agreement,[52] and (b) seeking a declaratory judgment that Celerity's violation of Velocity's brand usage guidelines was a material breach of the second reseller agreement entitling Velocity to terminate the agreement. (Civil Action No. 09–151, Docket No. 1).

On March 17, 2009, Celerity filed an answer to Velocity's complaint in this case which included counterclaims against Velocity for breach of contract, breach of the implied duty of good faith and fair dealing and tortious interference with existing and prospective contractual relations. The counterclaim for tortious interference with existing and prospective contractual relations also was asserted against Elias.[53] In addition, Celerity asserted a counterclaim against Velocity in which it sought a declaratory judgment that Velocity materially breached the second reseller agreement entitling Celerity to terminate the agreement. (Docket No. 12). Six days later, Celerity filed an answer and the same counterclaims and third-party claim against Velocity and Elias in Civil Action No. 09–151. (Civil Action No. 09–151, Docket No. 13).

---

**52.** Velocity's claim against Celerity for breach of the second reseller agreement's non-solicitation provision related to Celerity's direct contact with a representative of Morton's. (Civil Action No. 09–151, Docket No. 1, ¶¶ 45–53, 79–85).

**53.** Because Elias was not a plaintiff in this case, the Court notes that Celerity should have filed its claim against Elias in a third-party complaint, not as a counterclaim. Nevertheless, the claim will be treated as a third-party claim.

On April 14, 2009, Velocity and Elias filed a motion to dismiss Counts II through IV of Celerity's counterclaims in this case and in Civil Action No. 09–151 pursuant to Fed.R.Civ.P. 12(b)(6). (Docket No. 14, Civil Action No. 09–151, Docket No. 15). Thereafter, on May 27, 2009, the parties filed a joint motion to consolidate Civil Action No. 09–151 with this case for all purposes. The motion was granted and Civil Action No. 09–151 was closed. (Civil Action No. 09–151, Docket Nos. 18 and 19).

On June 9, 2009, 2009 WL 1616522 the Court filed a Memorandum Opinion and Order (a) denying without prejudice the motion of Velocity and Elias to dismiss Counts II through IV of Celerity's counterclaims and (b) directing Celerity to file an amended answer and counterclaims.[54]

### Velocity's Termination of Second Reseller Agreement

Despite Velocity's pending request for a declaratory judgment that it was entitled to terminate the second reseller agreement based on Celerity's material breaches of the agreement, on September 2, 2009, Velocity's counsel sent the following letter to Celerity's counsel:

Dear Mr. Harmon:

VELOCITY International, Inc., dba VELOCITY Broadcasting ("VELOCITY") hereby provides notice to Celerity Healthcare Solutions LLC ("Celerity") pursuant to Section VIII of the Reseller Agreement dated October 17, 2007, that said Agreement is terminated effective immediately, for failure to cure the breaches identified in VELOCITY'S notices of material breaches dated December 16, 2008 and December 22, 2008. Celerity's authority to resell Velocity services and programming is hereby revoked. Any broadcasts that have been hardbooked pursuant to a signed customer agreement will be honored.

Very truly yours,

COHEN & GRIGSBY, P.C.

By: Barbara A. Scheib

(Docket No. 81–7, p. 6).

Upon receiving Velocity's September 2nd termination letter, Celerity sought a clarification. Velocity's counsel responded on September 3rd as follows:

Dear Mr. Harmon:

This letter responds to your correspondence of September 2, 2009 inquiring as to Velocity Broadcasting's position regarding certain scheduled and proposed broadcasts. The only event hard-booked as of the termination of the Reseller Agreement was the Sanofi Aventis broadcast scheduled for October 14, 2009. It is therefore Velocity's understanding that Sanofi Aventi is under contract, and Velocity will honor that broadcast. The remaining proposed broadcasts have not been scheduled or hard-booked, and it is therefore Velocity's understanding that those broadcasts are not under contract. Given those understandings, Celerity does not have authority to sell Velocity's services or bind Velocity to any contractual obligation with respect to any of the remaining proposed events.

Very truly yours,

COHEN & GRIGSBY, P.C.

By: Barbara Scheib

(Docket No. 95–1, p. 2).

Also on September 3rd, Elias sent the following letter to Celerity's customers:

---

54. Two weeks later, Celerity filed the amended answer and counterclaims adding another counterclaim against Velocity for breach of contract relating to the failure of the audience response system during the Enablex broadcast in Blue Bell, Pennsylvania on May 28, 2009. (Docket No. 23).

Please be advised that *effective (Wednesday, September 2, 2009)*, VELOCITY Broadcasting has terminated Celerity Healthcare Solutions, LLC, as an authorized VELOCITY reseller.

Therefore, Celerity Healthcare Solutions may no longer sell or represent VELOCITY'S suite of private broadcasting and precision marketing services. In addition Celerity may not: sell, market, promote, license or otherwise represent private broadcasts, via satellite, internet, or other similar broadcast media, into restaurant or other hospitality venues until September 2, 2010.

Please do not hesitate to call Susie Franklin, Senior Vice President, Strategic Bus Development at VELOCITY Broadcasting (412.316.6100 or 800.755.9001) should you have any immediate questions about this change to our authorized reseller network or your business relationship with VELOCITY Broadcasting.

A VELOCITY Broadcasting Account Services Representative will be contacting you soon to discuss our array of services.

Philip Elias

President and CEO

(Docket No. 76–2, p. 2).[55]

### The Sanofi Aventis Broadcast

Following Velocity's termination of the second reseller agreement with Celerity, the parties completed one broadcast that had been sold by Celerity to Sanofi Aventis prior to the termination. As noted previously, the payment terms of Velocity and its hospitality partners, Morton's and Maggiano's, require advance payment of F & B revenue minimums, and, following each broadcast, a final bill is sent for the F & B charges exceeding the minimum. Consistent with this practice, on October 29, 2009, Velocity sent an invoice to Celerity for $54,308.63 in excess F & B charges for the Sanofi Aventis broadcast. Celerity has withheld payment of $50,000 of the invoice amount on the ground that Velocity "left Celerity's name and logo off of the walk-in graphics, credits, poster and all signage" at the Sanofi Aventis broadcast.[56] (Docket No. 90–45, p. 2, 97, ¶¶ 147, 149–52, 154).

### III

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With respect to contract claims, "where ... a contract is unambiguous, it is appropriate for the court to determine its meaning as a matter of law at the summary judgment stage." *LeJeune v. Bliss–Salem, Inc.,* 85 F.3d 1069, 1073 (3d Cir.1996). *See also Emerson Radio Corp. v. Orion Sales, Inc.,* 253 F.3d 159, 164–65 (3d Cir.2001) (A court "can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted is subject to only one reasonable interpretation.").

---

**55.** According to Celerity, Elias's September 3, 2009 letter to its clients "was the death knell for Celerity. Not only did it deprive Celerity of its core business (*i.e.,* selling Velocity broadcasts), but it put Celerity out of business altogether by causing its clients to fear the prospect of litigation if they continued to do business with Celerity." (Docket No. 83, p. 22).

**56.** Gatzulis maintains that $50,000 is the "minimum cost" or damage incurred by Celerity as a result of the omissions by Velocity. (Docket No. 97, ¶ 155).

## IV

### Cancellation Fees for the Effient Broadcasts

Both Velocity and Celerity seek judgment as a matter of law on Velocity's breach of contract claim arising out of Celerity's refusal to pay the cancellation fees invoiced by Velocity for the Effient broadcasts that could not proceed in late 2008 due to the failure of the product to obtain FDA approval. Regarding general principles of contract interpretation under Pennsylvania law, in *Krizovensky v. Krizovensky*, 425 Pa.Super. 204, 624 A.2d 638 (1993), the Superior Court of Pennsylvania stated: [57]

\* \* \*

... When interpreting a contract, a court must determine the intent of the parties and effect must be given to all provisions in the contract. *Dept. of Transp. v. Manor Mines, Inc.*, 523 Pa. 112, 565 A.2d 428 (1989). It is firmly settled that the intent of the parties to a written contract is contained in the writing itself. *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659 (1982). When the words of a contract are clear and unambiguous, the intent is to be found only in the express language of the agreement. *Id.* Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract. *D'Huy* [*v. D'Huy*, 390 Pa.Super. 509, 568 A.2d 1289 (1990) ], *supra*. Where the contract terms are ambiguous and susceptible of more than one reasonable interpretation, however, the court is free to receive extrinsic evidence, *i.e.*, parol evidence, to resolve the ambiguity. *Id.* A contract will be found to be ambiguous:

if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

*Z & L Lumber Co. of Atlasburg v. Nordquist*, 348 Pa.Super. 580, 585–86, 502 A.2d 697, 700 (1985) (citations omitted).

\* \* \*

624 A.2d at 642.

With respect to the issue of Celerity's obligation to pay cancellation fees for the Effient broadcasts, Velocity and Celerity assert that the second reseller agreement is clear and unambiguous and the Court agrees. Accordingly, there is no need for receipt of extrinsic evidence to interpret the second reseller agreement on this issue.[58]

**57.** There is no dispute that the second reseller agreement is governed by Pennsylvania law. (Docket No. 90–3, p. 5).

**58.** Although Velocity and Celerity maintain the second reseller agreement is clear and unambiguous, both parties have submitted extensive extrinsic evidence in support of their summary judgment motions on the issue of Celerity's obligation to pay cancellation fees for the Effient broadcasts as noted in the Court's lengthy summary of the undisputed facts. In this connection, the Court notes that its consideration of extrinsic evidence at this stage of the proceedings would be limited to determining whether a latent ambiguity exists, i.e., an ambiguity arising from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language, on its face, appears clear and unambiguous. To establish a claim of latent ambiguity, a party's extrinsic evidence must

Velocity's breach of contract claim for damages arising out of Celerity's refusal to pay the cancellation fees invoiced for the Effient broadcasts is based on Section III.A. of the second reseller agreement which provides: [59]

\* \* \*

A. *Fees and Payment:* Reseller will pay Velocity the fees set forth in Velocity's then-current Rate Cards for Velocity Services ("Fees") and will use best efforts to do so in accordance with Velocity's standard payment terms as set forth therein for each Broadcast that Reseller **sells** to a Customer.... (emphasis added).

\* \* \*

Velocity and Celerity dispute the meaning of the term "sells" in Section III.A. Celerity asserts that under any reasonable interpretation of the term, a broadcast is not "sold" if its customer has no contractual obligation to buy the broadcast. Because it is undisputed that MMEG never executed a contract for either Effient broadcast (which, as noted in the summary of the undisputed facts, was based on MMEG's objection to the IP provision in the Velocity Broadcasting Agreement), Celerity maintains that Velocity is not entitled to collect cancellation fees for the Effient broadcasts under Section III.A. of the second reseller agreement.

■ On the other hand, Velocity contends that for a broadcast sold through a reseller (as opposed to a broadcast directly sold to an end customer by Velocity), the reseller's contractual obligation to submit payments to Velocity and/or to pay cancellation fees to Velocity arises under Article III.A. of the second reseller agreement when a broadcast is "firm booked," *i.e.,* when the non-refundable deposits to reserve private dining rooms at Morton's or Maggiano's for a broadcast are paid. After consideration, the Court finds Velocity's interpretation of the term "sells" un-

---

show that some specific term or terms in the contract are ambiguous. It cannot simply show that the parties intended something different that was not incorporated into the contract. Further, to be capable of establishing a latent ambiguity, the alternative meaning that a party seeks to ascribe to the specific term or terms in the contract must be reasonable. If a party offers extrinsic evidence capable of establishing a latent ambiguity, a decision as to which of the competing interpretations of the contract is the correct one is reserved for the factfinder, which, in this case, would be a jury. *See Bohler–Uddeholm America, Inc. v. Ellwood Group, Inc.,* 247 F.3d 79 (3d Cir. 2001). Neither Velocity nor Celerity has argued that a latent ambiguity exists in the second reseller agreement and the Court can find none. Thus, there is no basis for the Court to consider the parties' proffered extrinsic evidence concerning Celerity's purported obligation to pay cancellation fees for the Effient broadcasts.

**59.** As noted in footnote 9, there is no provision in the second reseller agreement ad-

dressing the issue of broadcast cancellations. Rather, terms relating to broadcast cancellations are set forth in a provision of the sample Velocity Broadcasting Agreement attached to the second reseller agreement as Exhibit B. In the event Velocity's breach of contract claim regarding Celerity's failure to pay cancellation fees for the Effient broadcasts was based on the provision in the second reseller agreement designating Velocity as a third-party beneficiary of the broadcast agreements executed by Celerity and its clients, Celerity argued in support of its motion for summary judgment that Velocity cannot be a third-party beneficiary of a broadcast agreement that was never executed by MMEG. (Docket No. 83, pp. 28–29). In response, Velocity clarified the basis of its initial breach of contract claim against Celerity. Specifically, Velocity is not seeking payment of the cancellation fees from Celerity as a third-party beneficiary of a broadcast agreement with MMEG. Rather, it is seeking payment of the cancellation fees pursuant to Section III.A. of the second reseller agreement with Celerity. (Docket No. 95, p. 22).

tenable.[60]

The term "firm booked" does not appear in the second reseller agreement between Velocity and Celerity. Rather, it is found in the sample Reservation Confirmation Letter attached to the second reseller agreement as Exhibit C. Specifically, the Reservation Confirmation Letter provides that upon payment of a non-refundable deposit, the reservation of private dining rooms for a proposed Velocity broadcast is "firm booked." However, the Reservation Confirmation Letter also clearly states that Velocity will not commence work on a customer's proposed broadcast until a Velocity Broadcasting Agreement is signed. As a result, "firm booking" private dining rooms for a proposed Velocity broadcast cannot constitute a sale of the broadcast.

The term "sale" is defined in Black's Law Dictionary (9th ed.2009) as follows: "1. The transfer of property or title for a price. See UCC § 2–106(1). 2. The agreement by which such a transfer takes place. The four elements are (1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised." In the present case, there is no evidence to support the second and fourth elements of a sale. Specifically, due to the unresolved dispute over IP language, MMEG never agreed to the terms of Celerity's contract proposal for the Effient broadcasts and

never paid, or promised to pay, the proposed fees for those broadcasts.

In support of its motion for summary judgment on this claim, Velocity asserts that it "treats" a broadcast as "sold" for payment and billing purposes when private dining rooms at Morton's or Maggiano's are "firm booked" by the payment of the non-refundable deposit pursuant to the terms of the Reservation Confirmation Letter. (Docket No. 89, pp. 8–9). Simply put, the manner in which Velocity "treats" a proposed broadcast for its own accounting purposes at the time a non-refundable private dining room deposit is paid is irrelevant. As noted above, in the absence of mutual assent to the terms for producing the Effient broadcasts and a promise to pay, the broadcasts were never sold to MMEG and no obligation arose on the part of Celerity to pay any fees to Velocity under the second reseller agreement.

Based on the foregoing, Celerity's motion for summary judgment on this breach of contract claim will be granted and Velocity's cross-motion for summary judgment will be denied.[61]

### Section 43(a) of the Lanham Act

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which precludes the use of another's mark in a manner likely to confuse the public about the origin of goods, provides in relevant part:

**60.** The Court also finds untenable Velocity's assertion that "[t]he fact that Celerity reserved private dining locations and booked Velocity's studio ... **without** having a signed customer agreement in place constitutes a breach of the Reseller Agreement by Celerity, but it is not a defense (sic) Velocity's claim." (Docket No. 95, p. 19, fn. 5). Velocity fails to identify the provision of the second reseller agreement that was allegedly breached by Celerity's payment of the non-refundable deposits to reserve private dining rooms for the Effient broadcasts before MMEG had signed broadcast agreements and the Court can find none. In fact, this is the exact procedure

contemplated in the section of Velocity's Reservation Confirmation Letter captioned *"Next Steps."*

**61.** In light of the Court's conclusion that the terms of the second reseller agreement did not obligate Celerity to pay cancellation fees for the Effient broadcasts in the absence of MMEG's execution of broadcast agreements, the Court will not address Celerity's alternative argument that the cancellation fees sought by Velocity constitute an unconscionable penalty. (Docket No. 83, pp. 29–31).

§ 1125, False designation of origin, false descriptions, and dilution forbidden

(a) Civil action

(1) Any person who, on or in connection with any goods or services, . . ., uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

> \* \* \*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

\* \* \*

15 U.S.C. § 1125(a)(1)(A).

Velocity seeks damages from Celerity under Section 43(a)(1)(A) based on the "Overview" created by Janson in late 2006 or early 2007 to describe for marketing purposes the services offered by Celerity in concert with Velocity, As noted previously, the "Overview" refers to the "Celerity–Velocity HD Suites," the "Celerity–Velocity solution" and a "Celerity–Velocity broadcast." Velocity contends that by placing "Celerity" before "Velocity," the "Overview" falsely implied that Celerity was the originator, rather than a reseller, of Velocity's services and programs.

■ To establish a claim for false designation of origin or unfair competition under Section 43(a), Velocity must prove,

among other things, that Celerity's use of the mark or marks at issue to identify goods or services is likely to create confusion. *Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.,* 269 F.3d 270, 279 (3d Cir.2001). In *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460 (3d Cir. 1983), the Third Circuit Court of Appeals developed the following nonexhaustive list of factors for district courts to consider in determining whether there is a likelihood of confusion between marks for goods or services:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;

> (2) the strength of the owner's mark;

> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;

> (5) the intent of the defendant in adopting the mark;

> (6) the evidence of actual confusion;

> (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

> (8) the extent to which the targets of the parties' sales efforts are the same;

> (9) the relationship of the goods in the minds of consumers because of the similarity of function; and

> (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

721 F.2d at 463.[62]

Velocity maintains that there is no need to apply the *Lapp* factors in determining

---

**62.** The unfair competition claim under Sec-

tion 43(a) of the Lanham Act in *Lapp* involved

whether Celerity's "Overview" created a likelihood of confusion as to the origin of Velocity's broadcasts because its Section 43(a)(1)(A) claim is based on Celerity's breach of Section II.F of the second reseller agreement which granted a limited license to Celerity to use Velocity's marks for marketing activities. Citing, among other cases, *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185 (6th Cir. 1997) (Proof of continued, unauthorized use of original trademark by one whose license to use trademark had been terminated is sufficient to establish "likelihood of confusion," for purpose of trademark infringement action under the Lanham Act), and *Bunn–O–Matic Corp. v. Bunn Coffee Service, Inc.*, 88 F.Supp.2d 914 (C.D.Ill.2000) (Likelihood of confusion existed as a matter of law for purpose of establishing trademark infringement under the Lanham Act where trademark licensee continued to use marks owned by licensor after termination of license), Velocity asserts that likelihood of confusion exists as a matter of law where a licensee continues to use the licensor's marks after termination of the license. (Docket No. 95, pp. 33–35).

■ After consideration, the Court finds Velocity's argument unpersuasive. First, there is no evidence that Celerity contin-ued to distribute the "Overview" after its license to use Velocity's marks had been terminated, which did not occur until Velocity terminated the second reseller agreement on September 2, 2009.[63] Thus, *U.S. Structures* and *Bunn–O–Matic* are distinguishable from this case. Second, assuming Celerity was aware of the content of Velocity's 2008 usage guidelines when the "Overview" was distributed to potential customers for Velocity's private broadcasts (as the Court must do in ruling of Celerity's motion for summary judgment on this claim), a review of those guidelines reveals no provision which would put Celerity on notice that the mere placement of its name before Velocity's name in a description of the services they provided in concert was a violation of the guidelines. The 2008 usage guidelines focused on Logo Usage (which logo to use and when), Logo Composition (the fonts, colors and sizes to be used), Logo Positioning (the location of logos on the page or in proximity of other logos or messaging), Type Treatments (for stationery, collateral pieces and printed material), PowerPoint Templates (guide to the use and creation of presentations), and On–Air Use (production guidelines for consistent brand identity). (Docket No. 90–5). Thus, there is no basis for finding that Celerity's "Overview" violated Velocity's 2008 usage guidelines.[64]

---

non-competing goods. In *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d Cir.2000), the Third Circuit extended consideration of the *Lapp* factors to unfair competition claims under Section 43(a) involving competing goods.

**63.** Any claim by Velocity that Celerity's license to use its marks for marketing purposes was revoked by the cease and desist letter dated December 22, 2008 is meritless. The letter specifically provided for Celerity's continued use of Velocity's marks "in strict accordance with the Guidelines and the Reseller Agreement." (Docket No. 81–6, p. 3). The only distribution of the "Overview" after the December 22, 2008 cease and desist letter

occurred on March 10, 2009, six months before Celerity's license to use Velocity's marks was revoked by termination of the second reseller agreement.

**64.** Tellingly, as noted by Celerity, the section of a document created by Velocity on January 7, 2008 to provide, among other things, an overview of Celerity referred to the "Celerity–Velocity solution" (Docket No. 75–8, p. 3), and a power point presentation created by Velocity linked the parties' names together, stating: "The Velocity/Celerity experience informs, engages, excites and motivates audiences like nothing else." (Docket No. 75–2).

Turning to the likelihood of a potential customer for a Velocity private broadcast being confused by the "Overview" created by Celerity, the majority of the *Lapp* factors are not applicable because this case does not involve the usual situation in which a similar mark is adopted by another company, regardless of whether the other company's goods are competing or non-competing. Celerity was an authorized reseller of Velocity's private broadcasts at the time the allegedly infringing document was prepared and distributed. The Court does note, however, that there is no evidence that Celerity intended to mislead potential customers as to the producer of Velocity's private broadcasts (*Lapp* factor No. 5) and no evidence that anyone was actually confused by the "Overview" as to the producer of Velocity's private broadcasts (*Lapp* factor No. 6). Moreover, any possible confusion as to the producer of Velocity's private broadcasts created by Celerity's "Overview" was eliminated by the contract proposals provided by Celerity to its potential customers which stated in relevant part:

\* \* \*

"We are pleased to have an opportunity to offer private broadcast services, to be provided in conjunction with our partner Velocity Broadcasting, for your consideration through this Broadcast Event Agreement. Velocity produces live television events and broadcasts them over an encrypted satellite system to a network of private dining rooms and clubs around the world. Velocity has been chosen as the exclusive provider of private broadcasts by Morton's, The Steakhouse and Maggiano's, Little Italy . . . . Celerity Healthcare Solutions, LLC has partnered with Velocity Broadcasting to be the exclusive provider of their pro-

prietary satellite network to the life sciences industry . . . ."

(Docket No. 82–2, p. 2).

Finally, as noted by Celerity, there is no evidence that Celerity profited as a result of the alleged infringement of Velocity's service marks. Velocity was the only entity for which Celerity sold private broadcasts. Therefore, any profits earned by Celerity from distributing the "Overview" resulted in increased profits for Velocity. (Docket No. 83, p. 39). Under the circumstances, judgment will be entered in favor of Celerity as a matter of law on Velocity's claim under Section 43(a)(1)(A) of the Lanham Act.

### *Section 43(c) of the Lanham Act*

■ Velocity also asserted a claim against Celerity under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), which entitles the owner of a famous mark that is distinctive to an injunction against a person who uses a mark in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence of actual or likely confusion, competition or actual economic injury. Because (1) the remedy provided by Section 43(c) is limited to injunctive relief, (2) Velocity terminated its reseller relationship with Celerity on September 2, 2009, and (3) Celerity has no reason to distribute marketing materials representing a relationship between Celerity and Velocity, any claim under Section 43(c) is moot. Moreover, it appears that Velocity mistakenly cited Section 43(c) as a basis for its second Lanham Act claim against Celerity. Velocity did not allege that it was entitled to an injunction against Celerity to prevent the blurring of its service marks by dilution or tarnishment. Rather, Velocity alleged that it was entitled to injunctive relief under Section 43(c) because "Celerity's continued misuse of

Velocity's service marks ... has caused or is likely to cause consumer confusion," which is covered by Section 43(a) of the Lanham Act. Based on the foregoing, Celerity's motion for summary judgment on this claim will be granted.

### Celerity "Overview"

Velocity also asserts a breach of contract claim against Celerity based on the three references to "Celerity–Velocity" in the "Overview" which served as the basis for its Lanham Act claims against Celerity. To re-iterate, Velocity asserts that the placement of "Celerity" before "Velocity" violated the limited license granted to Celerity to use Velocity's service marks in Section II.F. of the second reseller agreement. For the reasons set forth above in connection with the identical argument raised in support of Velocity's claim against Celerity under Section 43(a) of the Lanham Act, the Court concludes that the "Overview" created by Celerity did not breach Section II.F. of the second reseller agreement. Accordingly, Celerity's motion for summary judgment on this claim will be granted and Velocity's cross-motion for summary judgment will be denied.

### Solicitation of Morton's

In the remaining breach of contract claim asserted against Celerity by Velocity (in Civil Action No. 09–151), it is alleged that Celerity "materially breached its contract with Velocity by soliciting Morton's in a manner detrimental to Velocity." (Civil Action No. 90–151, p. 12, f 82). In opposition to Celerity's motion for summary judgment on this claim, Velocity

failed to offer any evidence to support the claim. In fact, Velocity totally failed to address this portion of Celerity's motion for summary judgment. Under the circumstances, judgment will be entered in favor of Celerity and against Velocity on this breach of contract claim.[65]

### Velocity's Requests for Declaratory Relief

Finally, with regard to Velocity's requests for declaratory relief in Civil Action Nos. 09–102 and 09–151 which were prospective in nature (and never amended), the Court finds that Velocity's termination of the second reseller agreement on September 2, 2009 moots the requests. Thus, Velocity's requests for declaratory relief will be dismissed.

### V

As noted previously, Velocity and Elias have moved for summary judgment on Celerity's counterclaims and third-party claim. The claims will be addressed seriatim.

### Counterclaim I

Celerity asserts a counterclaim against Velocity for breach of the second reseller agreement based on (1) the cancellation fees imposed for the Effient broadcasts that had to be postponed/cancelled due to the failure of the product to receive FDA approval and (2) violations of the nondisclosure and nonsolicitation provisions in the second reseller agreement. (Court's Memorandum Opinion, Docket No. 21, p. 13)

---

**65.** In the motion for summary judgment on its breach of contract claims against Celerity arising out of the cancellation fees for the Effient broadcasts and its 2008 brand usage guidelines, Velocity also seeks judgment as a matter of law in connection with the $50,000.00 in excess F & B charges withheld by Celerity for the Sanofi Aventis broadcast which occurred after Velocity's termination of the second reseller agreement. (Docket No. 89, p. 22). Because this breach of contract claim was not included in the complaints filed by Velocity in this case and Civil Action No. 09–151 and Velocity never filed a motion to amend either complaint, the Court declines to address this claim.

*Cancellation fees*

For the reasons stated in connection with the parties' cross-motions for summary judgment on Velocity's claim for breach of contract based on Celerity's failure to pay the cancellation fees for the Effient broadcasts, there was no basis in the second reseller agreement for Velocity's claim that Celerity was obligated to pay such fees. Thus, Celerity's failure to do so did not constitute a material breach entitling Velocity to terminate the second reseller agreement.[66] Accordingly, Velocity is not entitled to summary judgment on this aspect of Celerity's first counterclaim.

### Non–Disclosure Provision

Section V of the second reseller agreement provided:

**V. Confidentiality and Non–Disclosure**

Each party to this Agreement may receive Confidential Information ... in connection with the performance of its obligations pursuant to this Agreement. Each party will exercise reasonable care to preserve and protect the confidentiality of the Confidential Information and will at a minimum use the same level of care and security it affords its own confidential information. Neither party will disclose the Confidential Information to third parties or use such Confidential Information for any purposes whatsoever other than as permitted or contemplated under this Agreement ....

(Docket No. 74–1, p. 4).

The term "Confidential Information" is defined in the second reseller agreement and

specifically includes "information related to Customers and Prospective Customers." (Docket No. 74–1, p. 2).

In opposition to Velocity's motion for summary judgment on this counterclaim, Celerity submitted uncontroverted evidence showing that in November 2008, while the second reseller agreement was in effect and Celerity was the exclusive reseller of Velocity broadcasts in the pharma sector, Franklin sent a list of the pharma clients to whom Celerity had sold Velocity broadcasts to O'Malley after he expressed a desire on behalf of Maritz to resell Velocity broadcasts in the pharma sector.[67] Under the circumstances, Velocity is not entitled to summary judgment in its favor on this aspect of Celerity's first counterclaim.

### Non–Solicitation Provision

▮ The non-solicitation provision in the second reseller agreement provided in relevant part:

**VII. No Solicitation**

Each party to this Agreement acknowledges and agrees that the other party ... invest[s] considerable resources to recruit, hire, retain, engage and/or contract with their respective employees, clients and Business Partners, and that the loss of employees, or interference with the relationships between either party ... and its respective clients or Business Partners would have considerable adverse impact on such party.... Therefore, each party agrees that during the Term of this Agreement and for

(Docket No. 74–1, p. 5).

---

**66.** With respect to termination, the second reseller agreement provided in relevant part:
 **VIII. Termination**
 A party may terminate this Agreement if the other party commits a material breach of this Agreement and fails to cure such material breach within thirty (30) days of receipt of notice from the nonbreaching party specifying the nature of the breach....

**67.** It is apparent that Franklin knew the list of pharma clients who had been sold Velocity broadcasts through Celerity was confidential. Franklin specifically stated in her email to O'Malley: "Our exchange is totally confidential at this point—keep close." (Docket No. 92–3, p. 22).

a period of twelve (12) months thereafter, such party shall not, directly or indirectly: ... (2) solicit for business ... any Customer, as applies to the restriction on Velocity, in any way that would be detrimental to the other party ...; or (3) interfere with any contractual or business relationship ... (ii) as applies to the restriction on Velocity, between Reseller and a Reseller Customer.

(Docket No. 74–1, p. 5).

In turn, the second reseller agreement defines a Celerity "Customer" to mean "an end customer who has purchased and is under contract for Velocity services from Reseller or any other entity, such as a Medical Communications Company 'MedCom' that has either contracted or subcontracted with Celerity for services that include Velocity Services." (Docket No. 74–1, p. 2). Celerity has submitted evidence showing that, despite the foregoing provision, Velocity began directly soliciting Celerity's customers while the second reseller agreement was

In support of its motion for summary judgment on this claim, Velocity asserts: "The non-solicitation term, by its plain language, applied only to companies who were parties to unexpired, current contracts for Velocity Services. At the time the Reseller Agreement was terminated by Velocity in September 2009, only one company— Sanofi Aventis—fit that description." (Docket No. 87, p. 18). In so arguing, Velocity ignores entirely the second part of the definition of a Celerity "Customer" in the second reseller agreement, i.e., **"or any other entity, such as a Medical Communications Company 'MedCom' that has either contracted or subcontracted with Celerity for services that include Velocity Services."** As noted by

Celerity, Velocity's proposed interpretation of the term "Customer" "makes no sense in the context of the nonsolicitation provision." (Docket No. 93, p. 31–32). There would be absolutely no reason for Velocity to solicit a Celerity customer that had executed a contract for a future Velocity broadcast.

In sum, the Court agrees with Celerity that the only reasonable interpretation of the term "Customer" in the second reseller agreement is one that included any entity that had ever contracted or subcontracted with Celerity for Velocity's broadcast services. Under the circumstances, Velocity is not entitled to summary judgment on this aspect of Celerity's first counterclaim.

### Counterclaim II

Celerity also asserts a counterclaim against Velocity for breach of an alleged oral agreement by Elias to extend a 10% discount on network access fees to AZ for any broadcasts in 2008. In its earlier motion to dismiss, Velocity asserted that this counterclaim was barred by Section X.F. of the second reseller agreement which provided: "This Agreement will not be modified or amended in any respect except by a writing duly executed by both parties." (Docket No. 74–1, p. 6). In denying Velocity's motion to dismiss on this ground, the Court noted that "well-established Pennsylvania law provides that despite the existence of 'no oral modification' provisions in a written contract, such modifications may be binding where the words or conduct of the parties show by 'clear, precise and convincing evidence' that the parties' waived that provision." [68] (Court's Memorandum Opinion, Docket No. 21, p. 9).

In support of its motion for summary judgment on this counterclaim, Velocity asserts that (1) the only evidentiary sup-

---

68. *See First Nat'l Bank v. Lincoln Nat'l Life* *Ins. Co.,* 824 F.2d 277, 280 (3d Cir.1987).

port for this counterclaim is Janson's testimony that he had a 10 to 15 minute discussion with Elias on an unidentified date during which Elias agreed to a 10% discount on AZ's network access fees in 2008, and (2) this evidence is insufficient to meet the applicable "clear, precise and convincing evidence" standard noted above.[69] (Docket No. 87, p. 30).

After consideration, the Court concludes that Velocity is not entitled to summary judgment on this counterclaim. Velocity fails to acknowledge significant evidence which supports this counterclaim. Specifically, upon receipt of the invoice for the first AZ broadcast in 2008, Celerity noted the omission of the 10% discount on AZ's network access fees and promptly brought the omission to Velocity's attention through Senko. After inquiring into the matter, Rhea confirmed that the 10% discount should have been applied and the invoice was revised Senko. Moreover, during his deposition, Elias conceded that the 10% discount for AZ's 2008 network access fees had been approved by Russell Rice, Velocity's President at the time.

### Counterclaim III

Next, Celerity asserts a counterclaim against Velocity for breach of the implied duty of good faith and fair dealing based on (1) Velocity's unreasonable refusal to allow modification of the IP provision in its standard broadcast agreement, and (2) Velocity's unreasonable refusal to permit MMEG to reschedule the Effient broadcasts in light of the continued failure of the FDA to approve the drug. (Docket No. 21, p. 13). As noted by Celerity, a review of Velocity's brief in support of summary judgment shows that Velocity did not move

for summary judgment on Celerity's bad faith claim on either of these grounds. Accordingly, this counterclaim is preserved for trial. (Docket No. 93, pp. 36–37, fn. 14).

### Counterclaim IV

■ The tort of intentional interference with the performance of a contract is set forth in Section 766 of the Restatement (Second) of Torts and has been adopted in Pennsylvania. *Walnut Street Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 97 n. 2 (Pa.Super.Ct.2009). Section 766 states:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Thus, to prevail on a claim for tortious interference with contractual relations under Pennsylvania law, a plaintiff must prove: (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm the existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference. *Acumed*

---

**69.** In support of its motion for summary judgment on this counterclaim, Velocity also notes "it is undisputed that Celerity paid numerous successive invoices without protest that did not contain the alleged discount." (Docket No. 87, p. 30). Velocity fails to mention the evidence submitted by Celerity which shows that upon discovery of this oversight, Celerity contacted Velocity and requested an adjustment.

LLC v. *Advanced Surgical Services, Inc.,* 561 F.3d 199, 212 (3d Cir.2009).

■ Celerity contends that Velocity and Elias tortiously interfered with its relationship with AZ by (1) refusing to permit modification of the IP provision in Velocity's standard broadcasting agreement to permit AZ to repurpose the broadcast scheduled for 2009 and the broadcasts proposed for 2009, and (2) increasing network access fees which negatively affected the same existing and prospective contractual relation. (Docket No. 21, p. 15, No. 23, pp. 19–20, ¶¶ 60–69).[70]

### The Stranger Rule

In support of its motion for summary judgment on this counterclaim, Velocity initially asserts that because it produces each broadcast and receives payment from Celerity for each broadcast, it is an essential party to Celerity's customer contracts and not a stranger to the economic relationship. Therefore, Velocity cannot be sued for interference with contracts with would-be buyers of its programs and services.[71] (Docket No. 87, p. 24).

In rejecting the identical argument in *Kernaghan v. BCI Communications, Inc.,* 802 F.Supp.2d 590 (E.D.Pa.2011), the district court stated:

\* \* \*

Defendant Clearwire does not dispute that Plaintiffs have alleged the second, third, and fourth elements of a tortious interference claim. However, they argue:

> With respect to the first element—the existence of a contractual relation between the claimant and a third party—courts around the country have uniformly held that a defendant must be a stranger to the underlying contract with which it allegedly interfered. Put another way, the party must tortiously interfere with a contract under which it has no "beneficial" or "economic" interest.

(Doc. No. 9–2 at 5). According to Clearwire, since the Agreement between Plaintiffs and BCI was formed for the benefit of Clearwire, Clearwire had a beneficial interest in the Agreement. Clearwire, therefore, was not a stranger to the Agreement and cannot be held liable for tortiously interfering with it.

In states which apply the "stranger" rule, a plaintiff must establish that the defendant was a "stranger" to the protected business relationship with which it allegedly interfered. *Edwards v. Prime, Inc.,* 602 F.3d 1276, 1302 (11th Cir.2010).

---

**70.** To the extent Celerity's fourth counterclaim could be read to include the actions of Velocity and Elias with regard to MMEG and the Effient broadcasts, those actions are the subject of Celerity's counterclaim for breach of the duty of good faith and fair dealing.

**71.** In connection with this argument, Velocity notes that it is well established in Pennsylvania that a party cannot be liable for interfering with a contract to which he is a party. (Docket No. 87, p. 24). As noted by Celerity, however, the Pennsylvania case law cited by Velocity in support of this principle is inapposite. *See Abel v. American Art Analog, Inc.,* 838 F.2d 691 (3d Cir.1988); *Wells v. Thomas,* 569 F.Supp. 426 (E.D.Pa.1983); and *DuSesoi*

v. *United Refining Co.,* 540 F.Supp. 1260 (W.D.Pa.1982). (Docket No. 87, p. 24). These cases involved officers or managerial employees of companies who were alleged to have interfered with contracts between their companies and third parties. The courts held that a claim for intentional interference with contractual relations could not be maintained because a party cannot interfere with its own contracts and a company necessarily acts through its officers and employees. In contrast, Celerity alleges interference by Velocity and Elias, an officer of Velocity, with contractual relationships between Celerity and its customers. (Docket No. 93, p. 24).

A defendant is a party in interest to a business or contractual relationship if the defendant has any beneficial or economic interest in, or control over, that relationship.... When the defendant is an essential party to the allegedly injured business relationship, the defendant is a participant in that relationship instead of a stranger to it.

*Id.*

The parties agree that there is no state court or federal court that has addressed whether the Pennsylvania Supreme Court would adopt and apply the "stranger" rule to a tortious interference claim. In each court decision relied upon by Defendant Clearwire in support of the Motion to Dismiss, the "stranger" rule has been adopted only in that jurisdiction, (footnote omitted).

As noted, the Supreme Court of Pennsylvania has adopted § 766 of the Restatement as the law in Pennsylvania. Section 766 and the commentary accompanying it do not contain a statement of the "stranger" rule as it has been defined in other jurisdictions. Under Pennsylvania law, a claim for tortious interference will survive only if a defendant is not a party to the contract alleged to have been tortiously interfered with. *See, e.g., Daniel Adams Assocs., Inc. v. Rimbach Publ'g,* 360 Pa.Super. 72, 519 A.2d 997, 1000–02 (1987) (holding that a tortious interference claim could not be maintained against a corporate officer of a publisher where the underlying agreement was between the publisher and a sales representative because "the corporation and its agent are considered one so that there is no party against whom a claim for contractual interference will lie"); ...

However broad this preclusive test under Section 766 appears to be in Pennsylvania, the Court will not expand the test to include language that a defendant be a "stranger" to the agreement, having no "beneficial or economic interest" in it. Under Pennsylvania law, Plaintiffs need only show the existence of a contract between Plaintiffs and a party other than Clearwire against whom they have brought the tortious interference claim....

*Id.* at 596–97.

Similarly, this Court declines to apply the stranger rule in this case.

**Third–Party Beneficiary Argument**

In a related argument, Velocity asserts that it is entitled to summary judgment on this counterclaim because it was a third-party beneficiary of the agreements between Celerity and its customers, and a party to a contract may not tortiously interfere with the contract. *See Motise v. Parrish,* 297 Fed.Appx. 149, 152 (3d Cir. 2008).

■ A party becomes a third-party beneficiary of a contract only where both parties to the contract express an intention to benefit the third party in the contract itself, unless the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties and performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. *Scarpitti v. Weborg,* 530 Pa. 366, 370, 609 A.2d 147 (1992).

■ While the second reseller agreement provided that Velocity would be deemed a third-party beneficiary of Celerity's broadcast agreements with its customers (Docket No. 74–1, p. 3), Velocity did not include this language in its standard broadcasting agreement on which Celerity was to model its customer agreements and

there is no evidence that such language was included in any of Celerity's executed customer agreements. (Docket No. 90–47). Despite the absence of such language, Velocity asserts that an intent on the part of Celerity and its customers to bestow a benefit upon it is clear from language in Celerity's customer proposals and agreements, noting statements such as Celerity offers "private broadcast services in conjunction with our partner Velocity Broadcasting;" "[s]atellite signal transmission will be provided through Velocity's designated satellite provider;" the broadcast production package will include a "Velocity HD set" and "Velocity/Morton's script-writing and editing;" and "[t]he services and associated fees for such services to be performed by Celerity and Velocity as part of your broadcasts are outlined in the Statement of Work above." After consideration, the Court rejects Velocity's claim that it was an intended beneficiary of the existing contract and the proposed contracts between Celerity and AZ for broadcasts in 2009. Rather, Velocity was an incidental beneficiary of those contracts.

In this regard, Section 302 of the Restatement (Second) of Contracts provides:

**§ 302. Intended and Incidental Beneficiaries**

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Comment e to Section 302 and an illustration thereunder states:

*e. Incidental beneficiaries.* Performance of a contract will often benefit a third person. But unless the third person is an intended beneficiary as here defined, no duty to him is created. See § 315.

**Illustrations:**

\* \* \*

17. B contracts with A to buy a new car manufactured by C. C is an incidental beneficiary, even though the promise can only be performed if money is paid to C.

The foregoing illustration is precisely the situation presented in this case.[72]

### *Privileged Conduct*

Velocity also asserts that the exercise of a contractual right does not constitute "wrongful" or "unprivileged" conduct. Because Velocity retained the right in the second reseller agreement to establish fees for its broadcast services and approve modifications of the provisions in its standard broadcasting agreement requested by Celerity's customers, Velocity contends that application of the increase in network access fees to AZ's 2009 broadcasts and Velocity's refusal to accept the modifications to the IP provision proposed by AZ for the 2009 broadcasts cannot for the

---

**72.** In any event, seven of the eight broadcasts for AZ in 2009 were prospective in nature and no broadcast agreements were executed by Celerity and AZ for those broadcasts. As noted by Celerity, in the absence of such agreements, there is no basis for Velocity to claim the status of a third-party beneficiary. (Docket No. 93, p. 23, fn. 6).

basis for Celerity's counterclaim for tortious interference with contractual relations. (Docket No. 87, pp. 26–27). After consideration, the Court concludes that Velocity is not entitled to summary judgment on this ground.

 As noted by Celerity, when a party has a contractual right to take an action, that action is privileged and proper only if done in good faith. *See Schulman v. J.P. Morgan Investment Mgt.*, 35 F.3d 799, 810 (3d Cir.1994); *Ross v. Canada Life Assurance Co.*, Civil Action No. 94–5557, 1996 WL 182561, at *12 (E.D.Pa.1996). (Docket No. 93, p. 27). As further noted by Celerity, the cases cited by Velocity in support of this argument do not dictate a different conclusion. In each of the cases, the court considered whether the conduct of the defendant that was alleged to have tortiously interfered with the plaintiff's contractual relationship was proper and, therefore, privileged. *Windsor Securities, Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 663–64 (3d Cir.1993); *Peoples Mtg. Co., Inc. v. Federal Nat'l Mtg. Assoc.*, 856 F.Supp. 910, 934 (E.D.Pa.1994); *Cloverleaf Dev., Inc. v. Horizon Financial F.A.*, 347 Pa.Super. 75, 500 A.2d 163, 167–68 (1985). (Docket No. 93, pp. 27–28).

Notwithstanding Elias's self-serving declaration that his challenged actions were taken "purely for business reasons and ... to fulfill his fiduciary duties to the corporation and its shareholders" (Docket No. 87, p. 28), the Court's lengthy summary of undisputed facts shows that Celerity has submitted sufficient evidence to raise a material dispute of fact as to whether Elias's actions were proper and, therefore, privileged or an attempt, as Celerity claims, to deprive Celerity of the exclusivity it had earned in the pharma sector through September 2010 and drive it out of business.[73]

### Personal Liability of Elias for Tortious Interference

Velocity and Elias also assert that there is no basis for the imposition of personal liability on Elias for interfering with Celerity's contracts because a corporation acts only through its officers and agents. (Docket No. 87, pp. 28–29). The Court disagrees.

 As noted by Celerity, Pennsylvania recognizes the participation theory as a basis for personal tort liability where the corporate officer is an actor who participates in the wrongful acts. *Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 621–22, 470 A.2d 86 (1983); *Mill Run Assocs. v. Locke Property Co., Inc.*, 282 F.Supp.2d 278, 287–88 (E.D.Pa.2003); *Strategic Learning, Inc. v. Wentz*, Civil Action No. 05–CV–0467, 2006 WL 3437531, at *7 (M.D.Pa.2006). Accordingly, Elias is not entitled to summary judgment on this counterclaim.

### Counterclaim V

Next, Celerity sought a declaratory judgment that it was entitled to terminate

---

**73.** For example, Velocity and Elias assert that the refusal to modify the IP provision as requested by Celerity's customers was based on a concern that the requested changes "would have a detrimental impact on the value of Velocity's brand and would undermine Velocity's ownership rights to the 'look and feel' of its programming." (Docket No, 87, p. 27). As noted by Celerity, this assertion makes no sense. There is no evidence that Celerity's customers were requesting the right to change the "look and feel" of a Velocity broadcast. They merely wanted to show a recording of the program after the conclusion of the live broadcast. (Docket No. 28). The Court also notes an email from Esswein to Franklin and Elias less than a week after Velocity terminated the second reseller agreement with Celerity in which Esswein states: "We should go through in detail every lead they ever listed on a sales Forecast and call every company direct. **These guys are done in this space.**" (Docket No. 92–10, p. 21).

the second reseller agreement based on Velocity's material breaches of the agreement. Like the declaratory judgments sought by Velocity in this case and Civil Action No. 09–151, this counterclaim is moot in light of Velocity's termination of the second reseller agreement on September 2, 2009. Accordingly, the request for declaratory relief will be dismissed.

### Counterclaim VI

■ Finally, Celerity asserts a counterclaim against Velocity for breach of an oral agreement to provide Celerity with the connectivity and technical services required to integrate ARS services into broadcasts for Celerity customers on May 28, 2009 and June 16, 2009. (Docket No. 23, p. 30). Velocity asserts that it is entitled to summary judgment on this counterclaim "because Celerity has failed to establish any damages arising from Velocity's alleged breach of its oral agreement. To the contrary, Mr. Gatzulis stopped payment on the check that had been sent to Velocity to pay for those charges." (Docket No. 87, p. 30).

After consideration, Velocity's motion for summary judgment on this ground will be denied. Although Gatzulis stopped payment on the check that had been issued to Velocity to pay for connectivity and technical support for the provision of ARS services during the May 28, 2009 broadcast in Blue Bell, Pennsylvania which failed, it does not follow that Celerity did not suffer any damages. Celerity marked up the fees charged to its customers for these services which could not be collected due to the failure of the ARS system during the May 28, 2009 broadcast and the total absence of ARS services during the June 16, 2009 broadcast.